**STATE of Minnesota, Respondent,**

v.

**Frederick Kemond JACKSON, Appellant.**

No. A05–1882.

Supreme Court of Minnesota.

Jan. 25, 2007.

Lori Swanson, Minnesota Attorney General, Saint Paul, MN, Mike Freeman, Hennepin County Attorney, Donna J. Wolfson, Assistant County Attorney, Minneapolis, MN, for Respondent.

Frederick Kemond Jackson, Appellant Pro Se, Stillwater, MN.

Suzanne Marie-Senecal-Hill, Assistant State Public Defender, Minneapolis, MN, for Appellant.

## OPINION

HANSON, Justice.

Appellant Frederick Kemond Jackson appeals his conviction for first-degree murder while attempting to commit aggravated robbery. Jackson, who served as a look-out during the attempted robbery, argues that the evidence was insufficient to establish his liability as an accomplice and to demonstrate that the victim's death was

reasonably foreseeable. Jackson claims that the omission of an instruction regarding corroboration of accomplice testimony was erroneous and prejudicial. Jackson also asserts that he was prejudiced by erroneous admission of certain evidence and by ineffective assistance of his trial counsel. We affirm.

At about 10:30 p.m. on October 21, 2004, K.W. borrowed a van owned by N.P. K.W. left N.P.'s house in North Minneapolis and drove one or two blocks to an intersection about one block from a Super USA convenience store. Jackson, Dominique Jefferson (a/k/a B-bay), James Bell, W.D., and D.P., N.P.'s daughter, were passengers. At the intersection, Jackson, Jefferson, and Bell exited the van and walked off toward a nearby house.

At about 10:51 p.m., Jefferson and Bell entered the Super USA store. The two men wore dark clothing, and their faces were covered with bandanas. Bell carried an AK–47 assault rifle. After demanding money from the clerks, Jefferson grabbed the rifle from Bell and shot one clerk, Mohamed Moulay El–Boudknili, in the chest. The bullet pierced El–Boudknili's heart and exited through his back, causing his death. The events in the store lasted about 16 seconds and were captured by the store surveillance cameras.

Several days later, after hinting at his knowledge of the murder in a conversation while on a bus to Arkansas, Jefferson was interviewed by police officers. Jefferson directed the police to N.P.'s house. The police executed a search warrant for that address, and N.P., D.P., and K.W. were interviewed. Based on information from these interviews, the police focused their investigation on Jefferson, Jackson, and Bell.

In an attempt to locate Bell and Jackson, several police officers went to Bell's home. While several officers spoke with Bell, another officer saw Jackson run out onto a rear second-floor balcony and then, after noticing the police presence, return inside. Both Bell and Jackson were arrested and driven to the homicide unit's headquarters, and a search warrant was executed for Bell's home. In Bell's bedroom, the officers found a bullet proof vest hidden under a mattress and an AK–47 assault rifle hidden under a floor vent and wrapped in a shirt. They also found a banana clip for an assault rifle and a Ruger pistol wrapped in a blanket and stuffed in a laundry chute.

Bell initially denied participating in the shooting and denied that Jackson had any role in the robbery. Eventually he admitted that he and Jefferson had entered the store to rob it while Jackson acted as a look-out. On December 16, 2004, Jackson, Jefferson, and Bell were indicted by a grand jury for first-degree murder while attempting to commit aggravated robbery for the shooting death of El–Boudknili.

Because Jackson argues that the evidence was insufficient to support his conviction, we will describe the trial testimony in some detail.

Bell testified for the prosecution and provided this description of events. Between 9 and 10 p.m. on October 21, Jackson and J.B. were at Bell's home. The three discussed the possibility of robbing the Super USA store. They discussed finding a "send-off man"—someone crazy enough to do anything—and J.B. suggested Jefferson. Bell, J.B., and Jackson then went to N.P.'s house at around 10:30 or 10:40 p.m. to talk to Jefferson. Later Bell got into the van with Jackson, Jefferson, K.W., D.P. and W.D.

Bell, Jackson, and Jefferson got out of the van at an intersection near the store. Jefferson told K.W. to wait for them. Jefferson produced a gun from his pants leg

and said "we're going to rob it," in reference to the Super USA store. Jefferson handed Bell the rifle and ordered Jackson to stay in the alley to serve as a look-out while Jefferson and Bell entered the store.

Bell described entering the store at about 10:50 p.m. and stated that Jefferson demanded money from the clerks. Bell had been carrying the rifle and, after a couple of seconds, Jefferson took the rifle from him and shot a clerk. Bell then fled back to where the van had been parked, discarding the rifle under a tree on the way. The van had moved, but Bell and Jefferson found it quickly and jumped in, joining Jackson who was already inside.

Once the three were back in the van, an argument ensued. Bell was upset with Jackson because he believed Jackson had not been properly acting as a look-out. Bell argued with Jefferson because he was upset that Jefferson had shot the clerk, and Jefferson responded by saying that he thought the clerk was reaching for something. Bell and Jackson left the van after just a few blocks. Bell then went back to his house, but left again later to retrieve the rifle, which he gave to Jackson.

Bell acknowledged that he had entered a plea agreement with the state, under which he was required to plead guilty to intentional second-degree murder and to testify against Jefferson and Jackson. In exchange for his plea and his testimony, Bell was to receive a 306–month prison sentence instead of facing a trial on a first-degree murder charge and a potential life sentence. Bell also indicated that he was suffering symptoms of mental illness. He explained that he has heard voices his entire life.

A psychiatrist examined Bell. She testified that he reported auditory and visual hallucinations and exhibited symptoms consistent with schizophrenia. She testified that Bell told her that the voices had not recently been commanding him to do anything and that they had nothing to do with the robbery. She stated her opinion that Bell understood his plea agreement, the meaning of the oath, and the difference between the truth and falsehoods. While she believed Bell was schizophrenic, she stated that it did not negatively impact his competency to testify. She testified that Bell's mental illness had nothing to do with his participation in the robbery, his subsequent confession, and his decision to testify against Jefferson and Jackson.

Bell's testimony was corroborated by the testimony of several other witnesses. K.W. testified to the following events. Shortly before 10:30 p.m., Bell and Jackson arrived at N.P.'s house, went upstairs, and had a conversation with Jefferson. K.W. drove a van containing Jefferson, Bell, Jackson, W.D., and D.P. to an intersection about one block from the Super USA store. At that intersection, Jefferson told K.W. to stop the van and Jefferson, Bell, and Jackson got out. Jefferson told K.W. that they would be back shortly, and K.W. saw the three men walk toward one of the nearby houses. After waiting for five to ten minutes, K.W. heard a "big boom," and she saw Jackson running. Jackson got in the van and told her to drive. After driving a short distance farther, Jefferson and Bell jumped in the van. Bell and Jackson got out a short while later and left on foot. K.W. claimed she did not know that a robbery had been planned and stated that she never saw anyone in possession of a gun.

D.P. testified that she rode in the van with Jefferson, Jackson, Bell, K.W. and W.D. on the night of October 21, 2004. Her testimony regarding the van ride and the departure of the three men from the van was largely consistent with that of Bell and K.W. D.P. testified that she waited in the van and, after 10 or 15 minutes, she

heard a gunshot. After the gunshot, Jefferson, Bell, and Jackson came running back to the van at approximately the same time. After the three men returned to the van, Jackson said he wanted to go back and get his gun. D.P. told Jefferson that they were not going to pick up anybody's gun using her mother's van. A minor argument ensued, and Jackson and Bell got out of the van when D.P. told them to leave.

Despite its similarity to the testimony of K.W. and Bell, D.P.'s testimony did exhibit some inconsistencies. D.P. revealed that she had failed to mention Jackson's name during a one- to two-hour police interview conducted a week after the murder. Instead, she told the police that only Bell and Jefferson were involved. In addition, D.P. admitted that she did not tell the grand jury that Jackson wanted to go back to get a gun. On cross-examination, D.P. testified that she did not recall whether the three men returned to the van at the same time. Furthermore, there was evidence that D.P. may have had trouble perceiving or recalling the events in question. D.P. admitted to having smoked marijuana and taken an ecstasy pill sometime before getting in the van.

D.M. also testified for the prosecution and corroborated much of Bell's testimony. D.M. was arrested for possession of crack cocaine in February of 2004. D.M. admitted prior convictions for second-degree assault in 1995, second-degree drug possession in 2000, and third-degree assault in 2000. While in jail, D.M. was housed near Jackson from February 24 to March 29, 2005, and then near Jefferson from April 6 to April 25, 2005. D.M. testified that he spoke with Jackson several times and that they got to know each other. D.M. testified that he learned private details from Jackson.

D.M. corroborated Bell's testimony as to Jackson's intent to participate in the robbery. Jackson admitted to planning the robbery and referred to Bell and Jefferson as his "crew." Jackson gave D.M. a detailed account of the events on the night the robbery, including his participation as a look-out, his plan to fire a warning shot from a pistol if anything went wrong, and the argument that occurred when Jackson, Bell, and Jefferson arrived back at the van. Jackson also related the events surrounding his arrest, including how he stepped out onto the second-story porch and how he ran back in to hide his pistol in a laundry chute. Jackson told D.M. that the AK–47 used in the robbery had been hidden under a floorboard in Bell's room, which also contained "a vest and some ammunition." One day when D.M. and Jackson were watching TV and a Ruger pistol was shown, Jackson told D.M. that he had a gun like that and that he carried the gun during the robbery at the store.

D.M. testified that Jefferson told him about the robbery as well. Jefferson told D.M. that Jackson had waited outside to act as a look-out while the others entered the store. Jefferson told D.M. about the two clerks, how he and Bell were dressed, and that when one clerk fumbled for something, Jefferson took the gun and shot the clerk when Bell hesitated.

In exchange for his testimony against Jackson and Jefferson, D.M. pleaded guilty to second-degree possession of narcotics and agreed to a sentence of one year in jail and five years probation. Without the plea agreement, D.M. faced either a plea bargain for a 49– or 50–month prison sentence or a trial and a potential presumptive guidelines sentence of 98 months in prison.

Jackson did not testify. The court neglected to give and Jackson failed to request an instruction that a conviction may

not be based on uncorroborated accomplice testimony. The jury found Jackson guilty of murder in the first degree while attempting to commit aggravated robbery, and he received a sentence of life imprisonment.

### I.

■ Jackson challenges the sufficiency of the evidence supporting the verdict against him. When reviewing the sufficiency of the evidence, we draw reasonable inferences in favor of the state and assume that the jury credited the state's witnesses and rejected any contrary evidence. *State v. Pippitt*, 645 N.W.2d 87, 92 (Minn.2002). Accomplice testimony alone, without corroboration, cannot support a guilty verdict. Minn.Stat. § 634.04 (2006). But this court "view[s] corroborative evidence in the light most favorable to the verdict and do[es] not require it to establish a prima facie case of the defendant's guilt." *Pippitt*, 645 N.W.2d at 93.

■ In finding Jackson guilty, the jury was first required to find that Jackson intentionally aided, advised, hired, counseled, or conspired with or otherwise procured Bell and Jefferson to commit the crime of aggravated robbery or attempted aggravated robbery. *See* Minn.Stat. § 609.05, subd. 1 (2006).[1] A criminal defendant's intent may be inferred from "factors such as defendant's presence at the scene of the crime, defendant's close association with the principal before and after the crime, defendant's lack of objection or surprise under the circumstances, and defendant's flight ·from the scene of the crime." *State v. Pierson*, 530 N.W.2d 784,

788 (Minn.1995). We conclude that the evidence was sufficient to show the requisite intent.

Bell and D.M. testified about Jackson's intent to commit the robbery. Multiple witnesses placed Jackson in the company of Jefferson and Bell before getting into the van. Multiple witnesses testified that, before the shooting, Jackson left the van and walked towards the store with Jefferson and Bell. Multiple witnesses testified that Jackson fled the scene in the van with Bell and Jefferson and that Jackson then left the van with Bell. Jackson was arrested with Bell at Bell's home and in the vicinity of the murder weapon. Even without Bell's testimony, ample evidence supports a finding that Jackson intended to aid in commission of the robbery. Jackson's primary complaint is that the witnesses against him are not credible, but, when reviewing for sufficiency of the evidence, we assume that the jury resolved judgments about credibility against Jackson.

■ The jury was also required to find that the murder of El–Boudknili was "reasonably foreseeable by [Jackson] as a probable consequence of committing or attempting to commit [aggravated robbery]." *See* Minn.Stat. § 609.05, subd. 2 (2006). "Whether the defendant could reasonably foresee that the victim would be murdered is a question of fact for the jury." *Pierson*, 530 N.W.2d at 789. We conclude that the evidence was sufficient to prove that the murder was foreseeable. Bell and Jefferson entered the store armed with a high-powered assault rifle. Bell testified that he and Jackson sought out Jefferson

---

1. The statute on aggravated robbery, Minn. Stat. § 609.245, subd. 1 (2006), reads:

    Whoever, while committing a robbery, is armed with a dangerous weapon or any article used or fashioned in a manner to lead the victim to reasonably believe it to be

a dangerous weapon, or inflicts bodily harm upon another, is guilty of aggravated robbery in the first degree and may be sentenced to imprisonment for not more than 20 years or to payment of a fine of not more than $35,000, or both.

because he was "crazy enough" to do anything. Jackson, as an accomplice to the attempted robbery, was aware of the basic details of the plan to use force or to threaten the use of force.

Accordingly, we hold that the jury's verdict is supported by sufficient evidence.

## II.

■■ Jackson argues that the district court's failure to instruct the jury that accomplice testimony must be corroborated was prejudicial error. A criminal conviction may not be based "upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense." Minn.Stat. § 634.04; *see also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.18 (5th ed.2006). "[T]rial courts have a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice." *State v. Strommen*, 648 N.W.2d 681, 689 (Minn.2002). In the absence of an instruction on accomplice testimony, this court should be concerned with the possibility that the jury rejected the corroborating evidence and convicted solely on the basis of the accomplice testimony. *Id.*

The state concedes that the jury should have been instructed that Bell's testimony, without adequate corroboration, is not sufficient to support a conviction. The parties also agree that, even though Jackson did not request such an instruction, we should determine whether omission of an accomplice corroboration instruction was harmless beyond a reasonable doubt. We have applied the harmless error standard in this context. *See, e.g., State v. Lee*, 683 N.W.2d 309, 316 (Minn.2004) (reviewing

for harmless error without discussion of whether that standard is appropriate). But we have also indicated that the matter of the proper standard of review is not settled. *See State v. Gail*, 713 N.W.2d 851, 863 n. 9 (Minn.2006) (noting the meager analysis in *Lee* and applying the harmless error standard because the claim failed under both the harmless error standard and the plain error standard). Because the parties are in agreement and because we would reach the same result under either a harmless error standard or a plain error standard, we review the record in this case to determine whether omission of the accomplice testimony corroboration instruction was harmless beyond a reasonable doubt.

We have typically considered several factors in determining whether a failure to instruct on corroboration of accomplice testimony constitutes reversible error, including whether the accomplice testified in exchange for leniency, whether the accomplice's testimony was emphasized in the prosecution's closing argument, and whether the accomplice's testimony was corroborated by significant evidence. *See Gail*, 713 N.W.2d at 864. We have also noted that "general instructions on witness credibility [may serve to alert] the jury to the potential for conflicting motivations behind certain testimony." *Lee*, 683 N.W.2d at 317.

In this case, the prosecutor did emphasize Bell's testimony during closing argument. And Bell received a reduced sentence as part of his plea agreement. But Bell's statements to police about Jackson's role were made long before the plea agreement and were based on vague promises regarding allowing Bell to see his family. Moreover, the jury was given an adequate general instruction on the credibility of witnesses. Finally, while many of the corroborating witnesses were impeached to

varying degrees, the evidence corroborating Bell's testimony is quite strong. Jackson was arrested in the company of Bell and in close proximity to the murder weapon. . Bell's testimony was extensively corroborated by the testimony of D.M. and, to a lesser extent, by surveillance footage and the testimony of K.W. and D.P. Significantly, all witnesses agreed on the basic facts of the crime. Given the strength of the corroborating evidence, we hold that omission of the accomplice liability instruction was harmless beyond a reasonable doubt.

### III.

Jackson's pro se supplemental brief raises several evidentiary issues. Jackson argues that the district court erred and the prosecutor committed misconduct when the state was permitted to present evidence that portrayed Jackson in a bad light.

For example, the state gave notice that it might seek to elicit certain evidence from D.M. that, by virtue of its specificity and private nature, tended to confirm that Jackson had confided in D.M. In particular, the state wanted D.M. to testify that Jackson told him that Jackson and someone known as Junior were in "the murder mob" and that Jackson had a murder-mob-related tattoo. The state also wanted D.M. to testify that Jackson told him that he had been shot by a man named B-bay. Jackson asked that this testimony be excluded on the grounds that it is more prejudicial than probative.

In addition, in order to show the relationship between Jackson and Jefferson, the state wanted D.M. to testify that Jackson told him that Jefferson was enlisted to help in the robbery because Jefferson owed Jackson a favor. The state wanted D.M. to testify about the reason Jefferson owed Jackson this favor, which was related to delivery of guns by Jackson to Jefferson in order to permit Jefferson and his brother to "retaliate to some people who shot them." Jackson asked that this testimony be excluded because it was prejudicial and because Jackson was not given proper *Spreigl* notice.

The district court ruled that D.M. could testify that he learned that Jackson had a tattoo so long as he did not make reference to gang affiliation, and D.M. was also allowed to testify that Jackson had previously been shot provided that he did not discuss the details of the incident. Finally, the court ruled that D.M. was not permitted to testify about "B-bay owing him a favor because of the transfer of guns." Jackson's counsel objected to the testimony regarding Jackson having been shot and assented to the ruling regarding the tattoo.

Jackson claims that the prosecutor's question to D.M. about Jackson's tattoo implied that Jackson was in a gang. Jackson also claims that D.M.'s testimony about Jackson having been shot by B-bay was improper and prejudicial because it implied both that Jackson was in a gang and that he was a bad person. Finally, Jackson asserts that D.M.'s testimony that Jackson contacted Jefferson about the robbery because Jefferson owed Jackson a favor constituted improper use of *Spreigl* evidence. Jackson claims that inadequate notice was given, that the evidence was not clear and convincing, and that the testimony was highly prejudicial because it implied that Jackson was involved with a gang and with criminal activities.

"Evidentiary rulings rest within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion." *State v. Amos,* 658 N.W.2d 201, 203 (Minn.2003). Evidence should not be admitted if it is irrelevant or if its

probative value is substantially outweighed by the potential of the evidence to prejudice the jury. Minn. R. Evid. 402, 403; *State v. Harris*, 521 N.W.2d 348, 353 (Minn.1994). The appellant bears the burden of proving that the trial court abused its discretion and that admission of the evidence was prejudicial. *Amos*, 658 N.W.2d at 203. In addition, Minn. R. Evid. 404(b) includes a notice requirement for admission of evidence of a defendant's other crimes or acts in a criminal prosecution. *See also* Minn. R.Crim. P. 7.02.

While gratuitous testimony about a defendant's gang membership or bad character may be unduly prejudicial, *see Harris*, 521 N.W.2d at 353, there was no actual mention of gang membership in this case. Moreover, the court excised the most prejudicial parts of D.M.'s proposed testimony. And, because the district court precluded any testimony about the specific reason why Jefferson owed Jackson a favor, no acts related to the favor were described to the jury and thus the requirements of Minn. R. Evid. 404(b) and of a *Spreigl* notice were not applicable. Accordingly, we hold that the district court did not abuse its discretion in making these evidentiary rulings.

### IV.

Jackson raises a claim of ineffective assistance of counsel, arguing that, first, his counsel failed to contact certain witnesses who would have been helpful to his case, and, second, that his counsel failed to request the accomplice instruction.

■■■■ To prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that "representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Martin*, 695 N.W.2d 578, 587 (Minn.2005) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) (quotation marks omitted). An appellant asserting a claim of ineffective assistance of counsel bears the burden of proof on that claim. *Id.* Finally, "a claim of ineffective assistance of trial counsel that cannot be decided on the district court record because it requires additional evidence need not be brought on direct appeal and may be brought in a postconviction petition." *Torres v. State*, 688 N.W.2d 569, 572 (Minn.2004); *see also State v. Gustafson*, 610 N.W.2d 314, 321 (Minn.2000) (indicating that, when the existing record is insufficient to evaluate counsel's decisions, a claim of ineffective assistance is properly raised in a postconviction proceeding).

■■■■ Jackson's claims about his counsel's investigation and witness contacts require consideration of facts not in the trial record. Accordingly, we deny those claims without prejudice to Jackson's right to raise them in a postconviction proceeding.

We reject Jackson's claim regarding his counsel's failure to request the accomplice instruction. Because we have ruled that the error in failing to give the accomplice corroboration instruction was harmless, under a standard more favorable to Jackson, we likewise hold that Jackson cannot prove an ineffective assistance of counsel claim based on the failure to request the jury instruction.

Affirmed.