*This opinion will be unpublished and*
*may not be cited except as provided by*
*Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-1691**

State of Minnesota,
Respondent,

vs.

Marco Anthony Gresham,
Appellant.

**Filed December 19, 2016**
**Affirmed**
**Larkin, Judge**

Hennepin County District Court
File No. 27-CR-14-19754

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godes, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Peterson, Presiding Judge; Larkin, Judge; and Kirk, Judge.

UNPUBLISHED OPINION

**LARKIN**, Judge

Appellant challenges his convictions of second-degree murder and attempted first-degree murder, arguing that the state's use of a peremptory challenge violated the Fourteenth Amendment of the United States Constitution and that the district court erred by allowing the state to introduce prior-bad-act evidence at trial. Appellant alleges several additional errors in a pro se brief. We affirm.

## FACTS

In October 2014, a grand jury indicted appellant Marco Anthony Gresham for first-degree murder for the shooting death of F.D. and attempted first-degree murder for the shooting of V.G. In June 2015, the district court began voir dire in Gresham's trial. The district court asked Juror M, an African American woman, questions regarding her husband's work with former prison inmates and her opinions regarding the criminal justice system. After the district court's questioning, the prosecutor moved to strike Juror M for cause, arguing that Juror M "clearly indicated a bias against the state." The district court denied the motion.

The prosecutor then questioned Juror M regarding her views on the criminal justice system, including: "[H]ave you participated in any of the Black Lives Matters kind of marches and stuff like that here?" After the prosecutor questioned Juror M, he renewed his challenge for cause. The district court once again denied the challenge. However, the district court allowed the state to strike Juror M peremptorily, over Gresham's objection.

2

The trial evidence indicated that in July 2014, Gresham, V.G., and F.D. were at a party in North Minneapolis. Gresham had been wearing a white shirt that evening. At some point, Gresham changed into a black shirt. V.G. witnessed the clothing change and became nervous. She thought that it signaled "something bad [was] going to happen." While at the party, V.G. told F.D. that "[Gresham] had allegedly did a homicide in St. Paul." The events that followed suggest that Gresham learned of V.G.'s statement to F.D. Gresham directed V.G. and F.D. to approach him. He asked them three times if they knew him. V.G. responded that she did not know Gresham. Gresham stated, "When the streets talk, you got to deal with your consequences." Gresham then shot V.G. in the stomach. V.G. fell to the ground and heard multiple gunshots fired in the direction of F.D. F.D. was also shot. V.G. survived her injuries; F.D. did not.

The jury found Gresham guilty of second-degree murder against F.D. and attempted first-degree murder against V.G. Gresham appeals.

## DECISION

## I.

Gresham argues that the district court erred by allowing the state's peremptory exclusion of Juror M over his objection. His argument is based on the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The Equal Protection Clause "forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986). "If . . . the facts establish, prima facie, purposeful

3

discrimination and the prosecutor does not come forward with a neutral explanation for his action, [Supreme Court] precedents require that [the resulting] conviction be reversed." *Id.* at 100, 106 S. Ct. at 1725.

In *Batson*, the Supreme Court established a three-step process to determine whether a peremptory challenge was racially motivated. *Id.* at 96-98, 106 S. Ct. at 1723-24; *see also* Minn. R. Crim. P. 26.02, subd. 7(3) (adopting the *Batson* three-step process). First, the objecting party must establish a prima facie case of purposeful discrimination. *Batson*, 476 U.S. at 96, 106 S. Ct. at 1723. Second, if the objecting party establishes a prima facie case, then the proponent of the peremptory challenge must provide a race-neutral explanation. *Id.* at 97, 106 S. Ct. at 1723. Third, the district court must determine whether the objecting party has established purposeful discrimination. *Id.* at 98, 106 S. Ct. at 1724.

Appellate courts "give great deference to the district court's ruling on a *Batson* challenge, recognizing that the record may not reflect all of the relevant circumstances that the court may consider." *State v. Pendleton*, 725 N.W.2d 717, 724 (Minn. 2007). However, if "the district court erred in applying *Batson*, [appellate courts] will examine the record without deferring to the district court's analysis." *Id.* at 726.

The district court denied Gresham's challenge at the first step of its *Batson* analysis, concluding that he did not "set forth a prima facie case." The court noted that "the questions related to disproportionality and racial profiling came about because of information initially introduced by the juror, not by the prosecutor." Because the district court concluded that Gresham failed to establish a prima facie case, the district court did not consider the second and third steps of the *Batson* analysis.

4

A prima facie case of purposeful discrimination is established "by showing: (1) that one or more members of a racial minority has been peremptorily excluded *and* (2) that circumstances of the case raise an inference that the exclusion was based on race." *State v. Onyelobi*, 879 N.W.2d 334, 345 (Minn. 2016) (quotations omitted). "The fact that the prospective juror is a member of a racial minority, alone, does not raise an inference that the exclusion was based on race." *State v. Wren*, 738 N.W.2d 378, 388 (Minn. 2007). The prima facie showing is based on "the totality of the relevant facts" of a proponent's conduct in the trial. *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S. Ct. 2317, 2324 (2005) (quotation omitted). A reviewing court will reverse a district court's determination that a prima facie showing of discrimination has not been established "only in the face of clear error." *State v. White*, 684 N.W.2d 500, 507 (Minn. 2004).

Gresham contends that the prosecutor's disparate questioning of Juror M supports an inference of racial discrimination. He argues that the prosecutor's questioning "indicates that the prosecutor was concerned that Juror M, because of her race, would be biased against the state's case." He argues that the following questions by the prosecutor were "clearly race-based": (1) "[H]ave you participated in any of the Black Lives Matters kind of marches and stuff like that here?" and (2) "[D]o you believe at least that there are [a] disproportionate amount of people of color who are going to prison?" The prosecutor also asked Juror M if she believed her son had been racially profiled. Gresham argues that the district court erred by ruling that he failed to establish a prima facie case, that "the record establishes an unrebutted presumption of racial discrimination in jury selection," and that he therefore is entitled to reversal.

5

The questions above arguably raise an inference that the state's peremptory challenge was based on race. But even if the district court erred by ruling that Gresham failed to establish a prima facie case, he is not automatically entitled to reversal. A defendant is entitled to reversal under *Batson* only if "the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action." *Batson*, 476 U.S. at 100, 106 S. Ct. at 1725. If a district court errs in applying *Batson*, an appellate court may examine the record to determine the validity of the *Batson* challenge. *See Pendleton*, 725 N.W.2d at 726. We therefore consider the second and third steps of the *Batson* analysis to determine whether the record establishes a *Batson* violation.

As to the second step, the proponent of the peremptory challenge must provide a race-neutral explanation for the exercise of the challenge. *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723. The proponent's reason "need not be persuasive, or even plausible; so long as discriminatory intent is not inherent in the [proponent's] explanation, the reason offered is deemed race neutral." *Onyelobi*, 879 N.W.2d at 345 (quotations omitted). In district court and on appeal, the state argued that the prosecutor was concerned regarding "Juror M's expressed bias against the police, her statement that it was difficult to presume innocence, and her ability not to consider the consequences of the verdict." These reasons do not reveal inherently discriminatory intent. Instead, they establish a race-neutral reason for the peremptory challenge.

6

The third step in a *Batson* analysis is to determine "whether the [objecting party] carried the ultimate burden of proving purposeful discrimination." *Id.* (quotation omitted). A sampling of the voir dire questions asked of Juror M is helpful at this point.

In questioning Juror M, the district court confirmed that her husband worked with criminal offenders. The court next asked her several questions regarding her views on the criminal justice system:

> Q:   Like other people have relatives who are cops and but you see more the effects on the offender side?
> A:   Um-hum.
> Q:   Anything about that that you think would make it difficult for you to be a juror?
> A:   Maybe?
> Q:   Can you explain?
> A:   Um, just because in my conversations with my husband, we tend to talk about the criminal justice system and the inequities in the system.
> . . . .
> Q:   Okay. You also — oh, do you have strong opinions as a result of your discussions with your husband or anything else about the prison system?
> A:   I do have strong opinions.
> Q:   Okay.
> A:   Um-hum.
> Q:   What, like tell me a little bit.
> A:   I just, I just think that the criminal justice system isn't always fair, I don't see it as always being fair. I see it as one-sided. I see it as a system that was built for and by those that are in power so that's who it works for.
> . . . .
> Q:   . . . Is there more beyond what you've told me? I mean, did you have any specific experiences or you are talking about like?
> A:   Um, no, but I have a son.
> Q:   Um-hum.
> A:   And he, he has been subject to, you know, being profiled. So, not for me personally, like I haven't had any bad or good experiences with police, but I see, you know, my son.

7

Q: How old is he?
A: 20.
Q: Okay. And he gets stopped an inordinate amount?
A: Yes.
Q: Okay. And who was involved in the robbery as a juvenile?
A: . . . [M]y husband.

The prosecutor continued the district court's line of questioning as follows:

Q: And so you both expressed opinions about how you feel about inequities in the system as it relates to the number of people that are affected by traffic stops as well as I guess people who are going to prison. Would that be fair to say?
A: Yes.
Q: And do you believe at least that there are [a] disproportionate amount of people of color who are going to prison?
A: Yes.
. . . .
Q: Okay. And I think earlier when the Judge was asking you questions, the Judge asked you if it mattered in your analysis as to sort of who was part of the system, and she indicated that, you know, as you sit here you look out and you see [defense counsel] who's African American and me, and I think your response was that it didn't really matter whether there were blacks or African Americans who were also part of the system, right?
A: Yes.
Q: And so it's not about race as far as the system goes, I mean, like who, the race of the people who are administering the system, for you it's the system itself that you have a problem with.
A: Yes.
Q: Are you done? You looked like you were still trying to.
A: It is the system, but I'm — I'm just going to go back to, it doesn't matter if we're black, purple, we all receive the same messages. So, um, yes, it's definitely the system, but the system is ran by people and those people receive, we all receive the same messages.
. . . .
Q: You indicated that your son, you believe your son has been racially profiled?
A: Yes.

8

These questions do not establish purposeful discrimination based on Juror M's race. Instead, the questions suggest that the prosecutor was concerned regarding Juror M's overall perception that the criminal justice system is unfair, regardless of race.

In sum, although some of the prosecutor's questions had racial overtones, the state provided a race-neutral explanation for the questions and Gresham did not prove purposeful discrimination. We therefore conclude that the district court did not err by denying Gresham's *Batson* challenge.

## II.

Gresham also argues that the district court erred by "admitting evidence that [V.G.] knew Gresham from a January 2014 Party in St. Paul at which someone was shot and killed, and that Gresham 'had allegedly did' it." The district court allowed the testimony over Gresham's objection and provided a cautionary instruction.

Gresham argues that V.G.'s statement "was not admissible as either immediate-episode or *Spreigl* evidence." Gresham's argument presumes that V.G.'s statement was inadmissible character evidence or evidence of a prior bad act. Evidence of prior bad acts, commonly known as *Spreigl* evidence, is not admissible to prove that a defendant acted in conformity with his character. Minn. R. Evid. 404(b); *State v. Spreigl*, 272 Minn. 488, 490, 139 N.W.2d 167, 169 (1965). "The overarching concern behind excluding such evidence is that it might be used for an improper purpose, such as suggesting that the defendant has a propensity to commit the crime or that the defendant is a proper candidate

9

for punishment for his or her past acts." *State v. Fardan*, 773 N.W.2d 303, 315 (Minn. 2009) (quotations omitted).

"Immediate-episode evidence is a narrow exception to the general character evidence rule." *State v. Riddley*, 776 N.W.2d 419, 425 (Minn. 2009). Such evidence is admissible "where two or more offenses are linked together in point of time or circumstances so that one cannot be fully shown without proving the other, or where evidence of other crimes constitutes part of the res gestae." *State v. Wofford*, 262 Minn. 112, 118, 114 N.W.2d 267, 271 (1962).

The district court held that evidence regarding V.G.'s statement to F.D. regarding Gresham's alleged participation in the St. Paul homicide was not inadmissible *Spreigl* evidence. The district court reasoned that the state offered the evidence regarding the St. Paul homicide to explain Gresham's intent, that "[i]ntent and premeditation are essential elements of First Degree Murder," and that "[i]t would be nearly impossible for the State to prove intent and premeditation without explaining why [Gresham] allegedly targeted the victims."

It is not clear to us that the challenged evidence—that V.G. told F.D. that Gresham was rumored to have shot and killed someone at a party in St. Paul in 2014—is prior-bad-act evidence. The state did not attempt to prove that Gresham in fact shot someone at the 2014 party. The state's evidence merely showed that V.G. told F.D. that Gresham "allegedly did a homicide in St. Paul." V.G. testified that she did not actually see anything pertaining to that homicide.

10

In similar circumstances, the Minnesota Supreme Court has held that such evidence is not prior-bad-act evidence. For example, in *State v. Salas*, the defendant challenged the admission of "testimony that showed defendant thought the victim was accusing him of having committed a prior crime." 306 N.W.2d 832, 833 (Minn. 1981). A witness testified that the defendant told him to convey to the victim that the victim should stop trying to implicate the defendant in a murder or the defendant would kill him. *Id.* at 833. The defendant argued that the testimony was inadmissible evidence of another crime. *Id.* at 836.

The Minnesota Supreme Court concluded that admission of the evidence was proper "even though the *Spreigl* procedure was not followed." *Id.* at 836-37. The supreme court reasoned that "the statement itself was neutral. It did not tend to prove that defendant committed a previous crime; it only tended to show defendant's motive for killing [the victim] because defendant thought [the victim] was accusing him of having committed a prior crime." *Id.* at 836. The court stated that the "testimony was admissible to show motive without regard to the *Spreigl* requirements." *Id.* The supreme court explained, "The evidence relating to other crimes of defendant was necessarily, but incidentally, a part of the substantive proof of the offense since defendant's fear that decedent would disclose such crimes to the police was his expressed reason for the murder." *Id.* at 837 (quotation omitted).

Like the circumstances in *Salas*, the evidence regarding V.G.'s statement was neutral. It did not tend to prove that Gresham committed the St. Paul homicide. Instead, it only tended to show Gresham's motive for shooting V.G. and F.D. The evidence

11

explained why Gresham would have shot V.G. and F.D. in the absence of any other motive or provocation. Because the evidence did not tend to prove that Gresham committed another crime, it was not *Spreigl* evidence or immediate episode evidence, and the law regarding that type of evidence is inapplicable.

Moreover, the district court's limiting instruction ensured that the jury did not use V.G.'s statement regarding the St. Paul homicide as evidence of a prior bad act. The district court instructed the jury that:

> The State will introduce testimony referring to a homicide that occurred in January 2014 in St. Paul. The defendant, Mr. Gresham, was not arrested, charged or convicted of that offense. This information is not being offered to prove that Mr. Gresham committed any crimes in St. Paul. The testimony may aid you in understanding or determining whether the defendant committed the acts which the defendant is charged with here, the murder of [F.D.] and the attempted murder of [V.G.]. The defendant is not being tried for and may not be convicted of any offenses other than the charged offenses here. You are not to convict the defendant on the basis of occurrences on January 2014 in St. Paul.

We presume that the jury followed the district court's cautionary instruction. *See State v. Budreau*, 641 N.W.2d 919, 926 (Minn. 2002).

In sum, the district court did not abuse its discretion by allowing V.G.'s testimony regarding her statement to F.D. about Gresham's rumored involvement in the St. Paul homicide.

## III.

Gresham raises several additional arguments in a pro se brief. He argues that V.G.'s testimony regarding the St. Paul homicide was inadmissible hearsay, received in violation

12

of the Confrontation Clause. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801(c). The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 60 n.9, 124 S. Ct. 1354, 1369 n.9 (2004); *see State v. Hull*, 788 N.W.2d 91, 100 (Minn. 2010) (explaining that Minnesota courts apply "an identical analysis under both the state and federal Confrontation Clauses"). V.G.'s statement regarding Gresham's alleged involvement in the St. Paul homicide is not hearsay because it was not offered for the truth of the matter asserted. Indeed, the district court instructed the jury that, "This information is not being offered to prove that Mr. Gresham committed any crimes in St. Paul." Because V.G.'s testimony was not offered for the truth of the matter asserted, it did not implicate the Confrontation Clause.

Gresham also argues that V.G.'s testimony was inadmissible because she lacked direct or personal knowledge. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Minn. R. Evid. 602. V.G. testified that she told F.D. about Gresham's rumored involvement in a homicide. V.G. did not testify that the rumor was true or that Gresham had actually committed the homicide. Because V.G. had personal knowledge of the rumor she repeated, her testimony did not violate rule 602.

Gresham argues that the state violated his right to due process by not disclosing the police reports regarding the St. Paul homicide. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

13

material either to guilt or to punishment . . . ." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963). "To establish a *Brady* violation, it must be true that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or it is impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) prejudice to the accused resulted." *State v. Brown*, 815 N.W.2d 609, 622 (Minn. 2012). Because the state did not allege or attempt to prove that Gresham committed the St. Paul homicide, police reports regarding the homicide are not exculpatory. Gresham's *Brady* argument is therefore unavailing.

Gresham argues that he was denied a fair trial because his counsel failed to "subpoena and investigate the St. Paul police reports" and failed to oppose V.G.'s testimony for lack of personal knowledge. "To prevail on an ineffective assistance of counsel claim, an appellant must demonstrate that representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Jackson*, 726 N.W.2d 454, 463 (Minn. 2007) (quotation omitted).

Claims of ineffective assistance of counsel based on trial strategy are generally not reviewable. *Opsahl v. State*, 677 N.W.2d 414, 421 (Minn. 2004). What investigation to conduct or objections to raise are generally matters of trial strategy and beyond review. *See State v. Nicks*, 831 N.W.2d 493, 506 (Minn. 2013) ("We give trial counsel wide latitude to determine the best strategy for the client."). However, failure to execute trial strategy may constitute ineffective assistance of counsel. *See id.* at 506-08 (concluding that counsel's conduct was not unreviewable trial strategy when "it appears that the cellphone-

14

record evidence was not obtained because trial counsel did not follow up on information received and did not perform the necessary steps to successfully execute on his main theory of the case").

"Generally, an ineffective assistance of counsel claim should be raised in a postconviction petition for relief, rather than on direct appeal." *State v. Gustafson*, 610 N.W.2d 314, 321 (Minn. 2000). However, we will consider an ineffective-assistance-of-counsel claim for the first time on appeal if the record is adequately developed. *Voorhees v. State*, 627 N.W.2d 642, 649 (Minn. 2001). The record is not adequately developed regarding Gresham's attorney's failure to subpoena and investigate the St. Paul police reports. In fact, Gresham requests remand to develop the record. Although we will not consider the merits of Gresham's ineffective-assistance-of-counsel claim on this record or remand for a hearing based on his assertions in this appeal, we preserve his right to pursue that claim in a postconviction proceeding under the requirements and standards prescribed by law. *See Jackson*, 726 N.W.2d at 463 ("[The defendant's] claims about his counsel's investigation and witness contacts require consideration of facts not in the trial record. Accordingly, we deny those claims without prejudice to Jackson's right to raise them in a postconviction proceeding.").

**Affirmed.**