STATE of Minnesota, Respondent,

v.

Aaron Joseph MORROW, Appellant.

No. A12–0079.

Supreme Court of Minnesota.

Aug. 7, 2013.

Lori Swanson, Attorney General, Saint Paul, MN; and John Choi, Ramsey County Attorney, Thomas Ragatz, Assistant Ramsey County Attorney, Saint Paul, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Michael F. Cromett, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

ANDERSON, G. BARRY, Justice.

Appellant Aaron Morrow appeals his convictions that arise out of an incident in which he repeatedly fired a semiautomatic AK–47 rifle at Joseph Rivera and two of Rivera's friends. A Ramsey County grand jury indicted him with nine counts, including one count of first-degree premeditated murder and two counts of attempted first-degree premeditated murder. Following a jury trial, Morrow was found guilty as charged. The district court sentenced Morrow to life in prison without the possibility of release for the first-degree premeditated murder conviction and to two consecutive 180–month sentences for the

convictions of attempted first-degree premeditated murder. On direct appeal, Morrow claims that the district court erred when it: (1) denied his pretrial motion to dismiss the indictment; (2) admitted his taped statement to police; (3) admitted a photograph of Rivera as a child; (4) denied his motion for a mistrial; and (5) denied his request for surrebuttal closing argument. He also raises several other claims in his pro se brief. We affirm.

Morrow had a father-son type relationship with R.W. On September 26, 2010, R.W. and his friend A.P. went to a party in St. Paul. Rivera and his two friends, D.C. and G.C., were also at the party. After several hours of partying, R.W. noticed that his cell phone was missing, which led him to verbally confront D.C. Before the confrontation, R.W. left the building and, using A.P.'s phone, called Morrow for a ride. R.W. told Morrow that he thought someone took his phone. Morrow drove to the party to pick up R.W. and witnessed the confrontation between R.W. and D.C. Morrow and R.W. then left the party and drove to Morrow's house, where Morrow retrieved a semiautomatic AK–47 rifle. The two men then drove back to the party, parking approximately one half-block away. Shortly after Rivera emerged from the party with his two friends, Morrow fired 15 shots in their direction. Rivera

died at the scene, suffering approximately 7 gunshot wounds. D.C. was shot in the leg, and G.C. escaped uninjured. Morrow and R.W. fled the scene, and Morrow later hid the gun in a relative's garage.

Morrow was later arrested, and Sergeant Scott Payne of the St. Paul Police conducted a taped, Mirandized interview with Morrow. During the interview, Morrow said, "If . . . I cooperated one hundred percent. Will you allow me to call my father and tell him why I'm up here?" Payne indicated that he would. Morrow then made a number of inculpatory statements. After the interview, Morrow called his father.

The State elected to present the evidence gathered by police to a Ramsey County grand jury. The prosecutor sent a letter to Morrow's counsel inviting Morrow to testify before the grand jury. Morrow's counsel informed the State that Morrow wished to testify if no plea agreement was reached. The State then sent a letter to Morrow's counsel stating that it would not call Morrow and would instead present the grand jury with a summary of Morrow's statements to police investigators.

Sergeant Payne provided the grand jury with a summary of Morrow's statements to police. The grand jury also heard testimony from D.C., G.C.,[1] and R.W.[2] The grand

1. Through D.C.'s and G.C.'s testimony, the grand jury was presented with evidence that there was a confrontation on the night of the shooting that started when R.W. approached Rivera and his two friends and said "I think one of you guys have my cell phone." After some back and forth, D.C. threatened to beat up R.W. if he continued to ask about the phone. No weapons were displayed or talked about during the confrontation. G.C. testified that later that night as he, Rivera, and D.C. left the party and began walking to D.C.'s car, he noticed R.W. and Morrow in Morrow's car. Morrow stepped out of the car and G.C. and D.C. testified that Morrow said "come here, I'm a friend." Morrow waved them

over toward him. D.C. asked Morrow who he was and walked toward Morrow. Morrow then raised a semi-automatic rifle, and the three men stopped and put their hands up. Morrow started shooting, and D.C. ran behind his nearby vehicle. Morrow moved away from his vehicle and continued shooting. D.C. was shot in the leg as he ran from Morrow. G.C. also fled from Morrow, but was not injured. Both D.C. and G.C. testified that they heard five or six shots, a pause, and then several more shots, resulting in a total of 10 to 15 shots.

2. R.W. testified that the only confrontation that took place on the night of the shooting

jury issued an indictment on January 19, 2011, charging Morrow with nine counts: one count of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2012); two counts of attempted first-degree premeditated murder, Minn.Stat. §§ 609.17 (2012), 609.185(a)(1); one count of drive-by shooting first-degree murder, Minn.Stat. §§ 609.185(a)(3), 609.66, subd. 1e (2012); two counts of attempted drive-by shooting first-degree murder, Minn.Stat. §§ 609.17, 609.185(a)(3), 609.66, subd. 1e; one count of second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2012); and two counts of attempted second-degree intentional murder, Minn.Stat. §§ 609.17, 609.19, subd. 1(1).

Morrow moved to dismiss the indictment on numerous grounds. The district court denied Morrow's motion, and Morrow petitioned the court of appeals for discretionary review. The court of appeals denied the petition. Morrow filed a motion to reconsider, and the court of appeals again denied Morrow's request for relief. Morrow petitioned our court for further review, and we denied the petition.

The case proceeded to trial on all charges. During the jury trial, the district court admitted a photograph of Rivera as a child, which the State presented during D.C.'s testimony regarding his childhood friendship with Rivera. The State's witnesses testified in a manner that was substantially consistent with their grand jury testimony. On direct examination of Sergeant Payne, the prosecutor asked a question that led Payne to reveal that Morrow was truant and once swore at a high school teacher. Defense counsel made a motion for a mistrial, which the court denied.

Morrow testified on his own behalf and claimed that he acted to defend himself and R.W. Specifically, Morrow testified that he knew R.W. was scared of Rivera and his two friends and that he had witnessed D.C. threaten to "stomp[ ] . . . out" R.W. He claimed that he did not drive away because the three men were spread out on the road and he would have had to run them over, and because he felt he would have had to leave R.W. at the scene. Morrow further testified that he had not seen anyone at the party with a weapon and that he fired at "center mass," which refers to "emergency protocol" used "instead of taking the time to aim."

The jury found Morrow guilty on all counts charged in the indictment. The district court sentenced Morrow to life in prison without the possibility of release for the first-degree premeditated murder of Rivera and to two consecutive 180–month sentences for the convictions of attempted first-degree premeditated murder of D.C.

was regarding his cell phone. R.W. testified that after the confrontation, Morrow drove toward Morrow's house and that when they were close to the house, R.W. got a call from A.P. A.P. told R.W. that R.W. had left his sweater and keys at the party and that A.P. would leave them outside under a tree. R.W. testified that he told Morrow that he left these items at the party. Morrow went into his house for a few minutes and came out carrying a large bag, which he placed in the trunk. Morrow and R.W. drove back to the party. R.W. left Morrow's vehicle to retrieve his sweater and keys. As he was gathering his personal effects, R.W. heard D.C. and another individual talking about leaving the party.

R.W. testified that he ran back to the car because he felt threatened when he heard the conversation. As R.W. got back in Morrow's car, Morrow left the vehicle and said something to get the attention of Rivera and his two friends, who were leaving the party. R.W. heard Morrow say something else, and then Morrow started shooting. R.W. saw Rivera with his hands up and saw D.C. and G.C. run away. R.W. also saw Morrow step away from the car, move toward D.C., and aim the gun at D.C. Morrow and R.W. then left the scene. Morrow called his cousin and drove to his cousin's house, where he hid the gun in the garage. R.W. testified that Morrow told him not to tell anyone about the shooting.

and G.C. This direct appeal followed. We consider each of Morrow's claims in turn.

## I.

Morrow first claims the district court erred in denying his motion to dismiss the indictment, which was based on an assertion that the State knowingly engaged in misconduct that substantially influenced the grand jury's decision to indict him. More specifically, he argues the State violated his purported right to testify before a grand jury, failed to present exculpatory evidence, failed to properly respond to the grand jurors' questions, and offered testimony that mischaracterized his statements to police. In response to Morrow's arguments, the State contends that Morrow had no right to testify before the grand jury, that the prosecutor did not commit misconduct in presenting the case to the grand jury, and that even if misconduct occurred, it did not require dismissal of the indictment. We conclude that the State has the more persuasive arguments.

"[A] presumption of regularity attaches to a grand jury indictment, and it is a rare case where an indictment is invalidated." *State v. Penkaty,* 708 N.W.2d 185, 196 (Minn.2006). A "criminal defendant bears a heavy burden when seeking to overturn an indictment," especially when "the challenge is brought after [the defendant] has been found guilty beyond a reasonable doubt following a fair trial." *State v. Scruggs,* 421 N.W.2d 707, 717 (Minn. 1988). But, "an indictment should be dismissed if the state knowingly engaged in misconduct that substantially influenced the grand jury's decision to indict and if we have grave doubts that the decision to indict was free of any influence of the misconduct." *Penkaty,* 708 N.W.2d at 196. We judge the effect of the misconduct on the grand jury proceeding "after looking at all of the evidence that the grand jury received." *State v. Lynch,* 590 N.W.2d 75, 79 (Minn.1999).

Under English law, the grand jury was "both an accusing tribunal and a venue for trial" that served as a "barrier against royal persecution." *Penkaty,* 708 N.W.2d at 196 (internal quotation marks omitted). Reflecting this notion, our current grand jury system seeks to not only "bring[ ] wrongdoers to justice" but to protect citizens against "unfounded and unreal accusations." *Id.* (internal quotation marks omitted). Therefore, a prosecutor has important responsibilities when presenting a case to a grand jury and must "see that justice is done." *Id.* "If a prosecutor abdicates his role as a minister of justice, the grand jury cannot serve its function of standing as a buffer between the state and the accused." *Id.* at 197. We have held that as part of a prosecutor's role as minister of justice, he or she must present exculpatory evidence to the grand jury. *E.g., State v. Roan,* 532 N.W.2d 563, 570 (Minn.1995) ("A prosecutor should not knowingly withhold evidence from the grand jury which would tend to substantially negate a suspect's guilt."). In addition, we have stated that as a "general rule, a prosecutor should honor a grand jury request for additional evidence." *State v. Wollan,* 303 N.W.2d 253, 255 (Minn.1981).

Morrow argues that he had a right to testify before the grand jury. His argument, however, is not supported by the Minnesota Rules of Criminal Procedure or our case law, a fact that Morrow conceded at oral argument. We conclude that the decision to call Morrow as a witness before the grand jury involved prosecutorial discretion, which was not abused under the circumstances of this case.

Morrow next argues that the district court should have dismissed the in-

dictment because the prosecutor allegedly failed to present exculpatory evidence to the grand jury. We conclude that this argument is also unpersuasive. Morrow contends that by not calling him as a witness in the grand jury proceedings, the State failed to present his testimony, which he claims would have been exculpatory. But, Morrow did not make an offer of proof regarding what exculpatory evidence he would have provided to the grand jury through his testimony, and therefore cannot demonstrate that the failure to present his testimony to the grand jury substantially influenced the grand jury's decision to indict. *See Penkaty,* 708 N.W.2d at 196.

Morrow further contends that the self-serving statements that he did not have a "plan" on the night of the shooting qualify as exculpatory evidence that should have been presented to a grand jury. Even if we assume that the statements in question constitute exculpatory evidence, Morrow's argument fails because he has not demonstrated that the failure to present the statements substantially influenced the grand jury's decision to indict him. The testimony of R.W., D.C., and G.C. before the grand jury provided overwhelming evidence of Morrow's guilt. Moreover, Morrow's overall version of events was highly inculpatory. In his statements to police, Morrow admitted that he drove to his house, retrieved an AK–47 semiautomatic assault rifle, returned to the party, fired 15 shots at the three victims, pointed the weapon at "center mass," failed to render aid to the victims, and hid the weapon after the crime. These facts strongly support a finding of premeditation. *See State v. Hurd,* 819 N.W.2d 591, 599–602 (Minn. 2012) (discussing conduct relevant to the issue of premeditation).

Our conclusion that the failure to provide the grand jury with Morrow's state-

ments or testimony did not substantially influence the outcome of the proceedings is also supported by the verdict. *Lynch,* 590 N.W.2d at 79–80 (concluding that while not determinative, it is proper to consider the fact that the defendant was found guilty beyond a reasonable doubt after a trial when determining whether an indictment should be dismissed). In this case, the petit jury was presented with Morrow's statements and heard Morrow testify, and concluded that the State proved Morrow's guilt beyond a reasonable doubt, a far greater burden than the State carried before the grand jury. *See State v. Jackson,* 770 N.W.2d 470, 485 (Minn.2009) (noting that the grand jury's task is to determine probable cause, not guilt or innocence).

For the same reasons, we find no merit to Morrow's argument that the prosecutor failed to properly respond to grand jurors' questions about Morrow's statements to police. That is, even if any of the questions asked by grand jurors triggered an obligation on the part of the State to provide Morrow's statements to the grand jury, *see Wollan,* 303 N.W.2d at 255, Morrow has not established that the State's failure to do so substantially influenced the grand jury's decision to indict him.

Morrow also argues that the district court should have dismissed the indictment because Sergeant Payne misled the grand jury by inaccurately summarizing Morrow's statements. We conclude that this argument also fails. Although Sergeant Payne's testimony contained inaccuracies, the overall impression given by the testimony was not so misleading that it required dismissal of the indictment. More specifically, Sergeant Payne told the grand jury that Morrow "indicated ... he got out and confronted and kind of waved [Rivera and his two friends] over and said, hey, come here.... He said something like come over here, I'm your friend." Ser-

geant Payne also testified that Morrow "said at that point is when he stood up and mentioned something like ... now who is in charge or something similar to that and started firing." Nothing in the record indicates that Morrow said something to the effect of "now who is in charge," and Morrow himself did not state that he said "come, here" or "I'm your friend." However, D.C. and G.C. told the grand jury that Morrow called them toward his vehicle and said "I'm your friend."

Sergeant Payne also described Morrow's statements regarding hiding the gun after the shooting, stating that Morrow told his cousin that he "had something that he wanted to put in the garage and he would pick it up later." Morrow actually stated that he called his cousin and asked his cousin if he wanted to "go do something" and that when his cousin told him he was going to bed, Morrow snuck into his cousin's garage and hid the gun. Although Sergeant Payne's summary was not entirely accurate, the important part of Morrow's statement was that Morrow confessed to hiding the gun after the shooting, not Morrow's description of the conversation that he had with his cousin before doing so.

In addition, Sergeant Payne testified to the grand jury regarding Morrow's statements about his plan on the night of the shooting in the following manner: "And he goes there was no plan. He said, you know, the plan was up here in my head...." In his statements, Morrow said that "the initial plan was you know, we weren't gonna do anything unless it had to be done" but later stated that "it wasn't really a plan, we went back to the [house], went got some smokes, we went back, he went to go get his sweater and he came

outside and I just started shooting.... So not very much of a plan but that's what happened." When asked if there was "a plan that was going on in [his] mind or is this something [he] verbalized," Morrow stated, "I wouldn't really verbalize that. Um, ... like I said if anything it probably ... was more of a 'look what we can do' you know 'cause like I said I ain't done anything before you know what I mean.... Like I said I'd figured they'd already been gone." Morrow's statements regarding his "plan" or lack thereof were equivocal, and Sergeant Payne's testimony on this point was a fair summary of those statements.

Sergeant Payne also told the grand jury that Morrow said he "would have killed [R.W.] if he would have tried to stop him." This is very similar to Morrow's statement that he "could have killed" R.W. if R.W. had tried to stop him. Finally, Sergeant Payne stated several times that Morrow told A.P. to make sure Rivera and his two friends stayed at the party. This is not a precise summary of Morrow's statements in this regard, but accurately reflects Morrow's state of mind and conduct before the shooting. Morrow told investigators that "if anybody" asked A.P. to keep Rivera and his two friends at the party it was him, that he wanted A.P. to stay so he "could call him and say ... where is everybody," and that he told A.P. to give R.W.'s liquor to Rivera and his two friends.

Sergeant Payne's testimony to the grand jury was problematic because of the imprecise and inaccurate summaries that he provided for some of Morrow's statements, but Morrow has not met the heavy burden that must be satisfied before we will overturn an indictment.[3] *Scruggs,* 421 N.W.2d at 717. Sergeant Payne's testimony re-

---

**3.** Our conclusion that Morrow failed to meet the heavy burden that must be satisfied before our court will overturn an indictment should not be viewed as endorsing Sergeant Payne's problematic testimony in this case.

garding what Morrow said to beckon Rivera and his two friends toward him was encompassed in the testimony of R.W., D.C., and G.C., and other aspects of Sergeant Payne's testimony constituted a fair summary of Morrow's statements or accurately summarized important facts. The impression given by Sergeant Payne's testimony was not so misleading so as to require dismissal of the indictment. This is particularly true after Morrow was found guilty beyond a reasonable doubt of premeditated murder. *See Lynch*, 590 N.W.2d at 79–80; *cf. State v. Montanaro*, 463 N.W.2d 281, 281 (Minn.1990) (requiring pre-trial dismissal of the indictment when "[a] reading of the Grand Jury transcript reveal[ed] that the prosecution improperly left the Grand Jury with a mistaken impression as to defendant's post-shooting conduct and statements and thereby with an arguably false impression of defendant's state of mind following the shooting").[4]

In summary, we conclude that Morrow has not demonstrated that any of the alleged misconduct by the State in this case "substantially influenced the grand jury's decision to indict," nor does any misconduct leave us with "grave doubts that the decision to indict was free of any influence of the misconduct." *Penkaty*, 708 N.W.2d at 196. Because Morrow has failed to meet his heavy burden, we conclude that the district court did not err in denying Morrow's motion to dismiss the indictment.

## II.

■ Morrow next claims that the district court erred in denying his motion to suppress his first statement to police because the statement was not voluntary. While in custody, Morrow was interviewed by Sergeant Payne and Sergeant Ken Jensen. Morrow was given a *Miranda* warning and signed a form acknowledging that he understood his rights. Morrow was also asked if he understood his rights, and stated that he did. Morrow's handcuffs were removed, he was given water, and he was allowed to smoke a cigarette. Early in the interview, Sergeant Payne told Morrow that he could not make a phone call while being interviewed and that he only would be able to contact an attorney, not family members, if he chose to end the interview. The following exchange then took place:

**Morrow:** I have a question. If at any time, say I cooperate one hundred percent. Will you allow me to call my father and tell him why I'm up here?

**Sgt. Payne:** I talked to your mom and dad.

**Morrow:** I want to talk to my father.

**Sgt. Payne:** Oh you will after the time runs out, but we can't let you. Not until that time runs out.

4. Morrow argues in his pro se brief that the prosecutor failed to present exculpatory evidence in the form of prior inconsistent statements of "most of the witnesses" that testified before the grand jury. For reasons similar to those discussed above, this claim lacks merit. *See State v. Moore*, 438 N.W.2d 101, 104–05 (Minn.1989) (indicating that prior inconsistent statements of grand jury witnesses, in which witnesses initially indicated that they were not present at the murder scene and failed to implicate the defendant, were not exculpatory, but reasoning that even if they were, the omitted statements would not have affected the grand jury's decision to indict). We also note that at oral argument, Morrow raised additional claims of misconduct before the grand jury that do not appear to have been raised in the district court and that were not argued in his brief to this court. Therefore, we will not consider these issues on appeal. *Melina v. Chaplin*, 327 N.W.2d 19, 20 (Minn.1982) (stating that an issue that is "not argued in the briefs ... must be deemed waived").

**Morrow:** But do you have an idea when that would be? If I cooperate one hundred percent?

**Sgt. Jensen:** Forty-eight hours.

**Morrow:** Forty-eight hours.

**Sgt. Jensen:** Yep.

**Sgt. Payne:** Actually I'll tell you what, if you tell me the truth and we know the truth, the complete truth, you lay it out and I, and I believe you[,] I'll let you call him now.

**Sgt. Jensen:** Every detail of the way we know it.

**Morrow:** You'll let me call him right now?

**Sgt. Payne:** Only if you tell me the truth. And I just talked to your dad and he's broken up big time.

**Morrow:** I know. My dad is the only person in this world who loves me.

**Sgt. Payne:** Your mom was with him too, but your dad was the one who had to hold his heart, 'cause he kept you know feeling that pounding. Does he have heart problems?

**Morrow:** Um, kind of.

**Sgt. Payne:** If not, he's having 'em now. That's where I just came from before I said will be right with ya?

**Morrow:** They're here?

**Sgt. Payne:** Not now, they went back home.

Morrow filed a motion to suppress his statement, arguing that the statement was involuntary. The district court denied Morrow's motion and the statement was admitted at trial.

▮▮▮▮ "The State must establish by a preponderance of the evidence that a statement was voluntary." *State v. Zabawa*, 787 N.W.2d 177, 182 (Minn.2010). We review "the totality of circumstances to determine whether the State met its burden to establish that a statement was vol-

untary." *Id.* We review de novo the district court's legal conclusion regarding whether the defendant's statement was voluntary, but "accept the underlying factual determinations of the district court regarding the circumstances of the interview unless the findings are clearly erroneous." *Id.*

▮▮▮▮ To determine the voluntariness of a defendant's statement, we ask whether the defendant's will was overborne at the time of his confession and "examine whether police actions, together with the other circumstances surrounding the interview were so coercive, manipulative, and overpowering that the defendant was deprived of his ability to make an independent decision to speak." *Id.* In making this inquiry, we consider factors such as the defendant's "age, maturity, intelligence, education, experience, and ability to comprehend" as well as "the nature of the interview, including its length, the lack of or adequacy of warnings, whether the defendant's physical needs were met or ignored, and whether the defendant was denied access to friends." *Id.* at 182–83. In *State v. Anderson*, 298 N.W.2d 63 (Minn. 1980), the defendant argued that his confession was involuntary because investigating officers promised to release his female friend if he confessed. *See id.* at 65. We concluded that the defendant's statements were voluntary when the defendant had several prior felony convictions, was advised of his right to remain to silent, was not threatened or subjected to prolonged interrogation, and when the defendant "himself raised the issue of making a statement if his woman friend was released." *Id.*

Morrow argues that his statement was involuntary because investigators "exploited [his] special relationship with his father." Specifically, Morrow asserts that his relationship with his father was used to

coerce his confession because investigators told Morrow that he could call his father if he cooperated and suggested that his father was experiencing heart problems.[5] The State contends that a review of the totality of the circumstances demonstrates that Morrow's statement was voluntary.

The district court's findings of fact regarding the circumstances surrounding Morrow's statement are not in dispute. Accepting the underlying factual determinations regarding the circumstances of the interview, we conclude that Morrow's first statement to police was voluntary. Morrow demonstrated at least average intelligence throughout the interview and conducted himself in a mature, articulate manner. *See Zabawa*, 787 N.W.2d at 182–83. Although Morrow had no previous experience with law enforcement, he affirmed his understanding of his rights both in writing and orally. *See id.* Morrow's physical needs were responded to and met, and the length of the interview was relatively short. *See id.* Similar to the defendant in *Anderson*, Morrow introduced the notion of cooperating in exchange for a phone call to his father. *Anderson*, 298 N.W.2d at 65.

In addition, although Morrow argues that his statement was involuntary because of his concern about his father's health and his desire to talk with his father, when Sergeant Payne and Morrow discussed Morrow's father, Morrow did not respond with concern or immediately confess. Instead, Morrow asked numerous questions about the workings of the prison system. These questions were part of Morrow's persistent effort to gather information from investigators and consider the op-

tions available to him at the time of the interview, which further undermines Morrow's argument that he was "deprived of his ability to make an independent decision to speak." *Zabawa*, 787 N.W.2d at 182. Moreover, Morrow was permitted to call his father at the end of the interview, and when he did so, he did not ask his father about his health, again demonstrating that Morrow's will was not overborne due to his concern for his father's condition. And Morrow's statements to his father do not otherwise indicate that his will was overborne by the earlier denial of access to his father. Under the totality of the circumstances, we conclude that the State met its burden in establishing by a preponderance of the evidence that Morrow's confession was voluntary. Therefore, the district court did not err in admitting Morrow's statement at trial.

### III.

Morrow's third claim is that the district court erred in admitting spark of life evidence in the form of a photograph of Rivera as a child. We review a district court's decision to admit photographic evidence for an abuse of discretion. *State v. Day*, 619 N.W.2d 745, 751–52 (Minn.2000).

Although "it is true that the quality or personal details of the victim's life are not strictly relevant to the issue of who murdered the victim, it would seem to tie unduly the hands of the prosecutor to prohibit any mention of the victim's life." *State v. Graham*, 371 N.W.2d 204, 207 (Minn.1985). Because "[t]he victim was not just bones and sinews covered with flesh, but was imbued with the spark of life[,] [t]he prosecution has some leeway to

---

5. Our analysis of Morrow's claim that his first statement to police was involuntary focuses on investigators' references to his father because that is the focus of Morrow's argument on appeal. But, even if we were to construe Morrow's claim more broadly to include an implicit challenge to other aspects of the investigators' behavior, our conclusion that Morrow's confession was voluntary would not change.

show that spark and present the victim as a human being." *Id.* The State may present spark of life evidence so long as it is not an attempt to invoke undue sympathy or inflame the passions of the jury. *Id.* We have previously held that the district court did not err in allowing spark of life evidence that included testimony by the victim's brother about the victim's "childhood, his education, his career, and his family" and "a photograph of [the victim] with his wife and two children at a Christmas party, and . . . a portrait of [the victim] in his police uniform." *State v. Evans,* 756 N.W.2d 854, 878 (Minn.2008). Similarly, we have affirmed the admission of spark of life photographs "where the photographs were used to provide background information about the family and to personalize [the victim] and where the number of photographs used for these purposes was small." *State v. Scales,* 518 N.W.2d 587, 593 (Minn.1994).

At trial, the State sought to admit a photograph of Rivera and D.C. taken during their childhood. Morrow objected, arguing that the photograph was inappropriate spark of life evidence that should be excluded. The district court allowed the State to use the photograph, but cautioned the State to rely on the photograph in a manner that was not calculated to create sympathy for Rivera.

On appeal, Morrow argues that the district court erred in admitting the photograph because it was used to invoke undue sympathy for Rivera and inflame the passions of the jury. Morrow also suggests that the spark of life photograph prejudiced his claim of self-defense and defense of others by depicting Rivera and D.C. as young children, because they were grown men at the time of the shooting. The State contends that the photograph was admissible spark of life evidence.

As in *Evans* and *Scales,* we conclude that the district court did not err in admitting the childhood photograph of Rivera and D.C. The photograph was shown while D.C. was testifying as to his childhood friendship with Rivera and was briefly discussed. The State did not rely on the photograph or discuss Rivera's life in the course of opening or closing statements, and there is nothing in the record to otherwise suggest that the State used the photograph to invoke undue sympathy or inflame the jury's passions. Rather, the photo was mentioned at the beginning of the trial when the State briefly outlined Rivera's life and gave background about his relationship with others involved in the shooting, and was well within the bounds of the spark of life doctrine. Finally, Morrow's argument that the photo was prejudicial because it undermined his claim of self-defense and defense of others lacks merit. As noted, the picture was briefly presented, and given that the jury saw D.C. testify, saw pictures of Rivera's body, and heard testimony about Rivera's stature, it is unreasonable to conclude that the jury considered the childhood photograph when evaluating Morrow's justification defenses. For all of these reasons, we hold that the district court did not err in admitting the spark of life photograph of Rivera and D.C.

IV.

■ Morrow's fourth claim is that he was denied due process of law and his right to a fair trial based on Sergeant Payne's testimony at trial. On direct examination, Sergeant Payne was asked about a portion of Morrow's statement in which he told officers that Rivera had assaulted one of Morrow's friends in high school. The prosecutor asked Sergeant Payne if he had "an opportunity to do any follow-up with regards to any incidents between Mr. Morrow and Mr. Rivera at

the high school." Sergeant Payne stated that he had, and the prosecutor then asked, "And did you learn anything?" Sergeant Payne answered: "I learned that the only documentation that Humboldt High School had was that Aaron Morrow was ... truant, and one time, swore at a teacher." At the conclusion of Sergeant Payne's testimony, Morrow moved for a mistrial, arguing that the "questions that prompted [Sergeant Payne's] answer seem[ed] ... preplanned." In response to the mistrial motion, the prosecutor asserted that he had not intentionally prompted Sergeant Payne to answer with inadmissible evidence and that Sergeant Payne's response was unexpected. Morrow then clarified his argument and said that he was "not trying to imply a setup." The district court found that the testimony was "inadvertent" and stated that it could not "conceive of a way in which truancy or swearing would be considered a bad act that would cause the jury to determine that ... one would have engaged in any of the acts with which Mr. Morrow is charged."

On appeal, Morrow argues that he was deprived of due process and his right to a fair trial because Sergeant Payne's answer was "a deliberate attempt ... to besmirch Morrow's character." The State argues that nothing about the contested question and answer indicates that the prosecutor or Sergeant Payne acted to intentionally elicit or provide the jury with inadmissible evidence, and that Morrow was not prejudiced by Sergeant Payne's testimony.

Morrow's argument lacks merit. The district court found that the prosecutor did not intentionally elicit the evidence given in Sergeant Payne's answer, and determined that the question asked by the prosecutor was one that sought to elicit admissible testimony that was relevant to the issue of Morrow's claim of self-defense. *Cf. State v. Silvers*, 230 Minn. 12, 22, 40 N.W.2d 630, 635 (1950) (concluding that the defendant was entitled to a new trial when the prosecutor persistently "ask[ed] incompetent or irrelevant questions calculated to prejudice defendant in the eyes of the jury").[6] Also, Morrow's accusation that Sergeant Payne engaged in misconduct was not raised to the district court, and, in his brief to our court, is based only on argumentative assertions that are unsupported by the record. And even if the answer given by Sergeant Payne were inadmissible, *see* Minn. R. Evid. 404(b), Morrow cannot demonstrate that he was prejudiced by Sergeant Payne's testimony. We have granted a defendant a new trial when "the impact of [a] prejudicial remark [is] such as to impart to the minds of the jury substantial prejudicial evidence." *State v. Reardon*, 245 Minn. 509, 513, 73 N.W.2d 192, 195 (1955). In this case, Sergeant Payne's testimony that Morrow was truant and once swore at a teacher in high school is far from the type of substantial prejudicial evidence that denies a defendant due process of law and entitles him to a new trial. *See id.*

## V.

Morrow's fifth claim is that the district court committed reversible error in

---

**6.** Morrow suggests that the prosecutor's question was directed toward an issue that was wholly irrelevant because although Morrow claimed that Rivera had assaulted one of his friends several years before the shooting, Morrow did not claim that the assault or any other fight between Morrow or Morrow's friends and Rivera took place at school. But Morrow's view of relevant evidence is unduly narrow. *See* Minn. R. Evid. 401. The record demonstrates that the prosecutor intended only to elicit evidence that Morrow and Rivera had no history of conflict while in high school. This lack of conflict between Morrow and Rivera was relevant to the State's task of disproving Morrow's claim of self-defense.

denying his request for surrebuttal closing argument. We disagree.

 The decision to grant surrebuttal closing argument lies within the sound discretion of the district court. Minnesota Rule of Criminal Procedure 26.03, subd. 12(k), provides that a district court "may allow" the defense a surrebuttal closing argument to the State's rebuttal closing argument "if the court finds the prosecution has made a misstatement of law or fact or an inflammatory or prejudicial statement in rebuttal. Rebuttal must be limited to a direct response to the misstatement of law or fact or the inflammatory or prejudicial statement." We review a district court's decision to limit closing arguments for an abuse of discretion. *State v. Richards*, 495 N.W.2d 187, 197 (Minn.1992) (citing *United States v. Bednar*, 728 F.2d 1043, 1049 (8th Cir. 1984)); *State v. Davidson*, 351 N.W.2d 8, 12–13 (Minn.1984).

In its rebuttal closing argument, the State argued:

> Lastly, I know there's talk about [R.W.] and him being given immunity. One of the instructions that you're gonna get from the Judge has to do with what actions, if any, was taken by a—by another person that's involved. It's the effect of non-conviction of the other person.
>
> You are not to concern yourself with what action, if any, was taken against the other person. [R.W.] was consistent. His testimony, with the information he gave the officers previously, if the effect that he had immunity up there on the stand, while telling you what happened, is of no consequence.

Morrow requested surrebuttal argument, contending that the State misstated the law regarding what information the jury could consider in determining R.W.'s credibility. The district court denied Morrow's request for surrebuttal argument, noting that "the jury is instructed to follow the instructions, not any arguments that Counsel might make" and finding that the State's argument "accurately reflect[ed] the instruction."

On appeal, Morrow argues that the district court abused its discretion by denying his request for surrebuttal closing argument because the prosecutor misstated the law regarding the effect of R.W.'s immunity. Morrow further asserts that this error was prejudicial and requires a new trial. The State argues that the district court did not abuse its discretion in denying Morrow's request. Further, the State contends that even if the district court erred, the error was harmless.

We need not decide if the district court abused its discretion in denying Morrow's request for surrebuttal argument because even if the district court erred, the error was harmless beyond a reasonable doubt.[7] Aside from R.W.'s testimony, there was

---

7. Depending on whether an alleged error implicates a constitutional right, we have applied two different harmless-error tests for determining whether the defendant was prejudiced by the alleged error. *State v. Sanders*, 775 N.W.2d 883, 887 (Minn.2009). When an error implicates a constitutional right, a new trial is required unless the State shows beyond a reasonable doubt that the error was harmless. *Id.* When an error does not implicate a constitutional right, a new trial is required only when the error substantially influenced the jury's verdict. *Id.* Although we have not squarely addressed whether a district court's denial of a request for surrebuttal argument implicates a constitutional right, we need not, and do not, decide the issue in this case for two reasons. First, Morrow has not briefed the issue of whether the constitutional harmless error standard applies in his case. Second, even under the more favorable constitutional harmless error standard, Morrow was not prejudiced by the alleged error.

overwhelming evidence of Morrow's guilt. Indeed, in light of Morrow's own statements and testimony, and the testimony of D.C. and G.C., R.W.'s testimony was cumulative. In addition, the district court properly instructed the jury regarding the factors to be considered in determining the credibility of witnesses and was told to disregard any statement by counsel if the "attorney's argument contains any statement of the law that differs from the law [given in the instructions]." Moreover, Morrow actually argued in his closing argument that the jury should *believe* R.W.'s testimony: "[R.W. is] protected. He's got immunity, and he told the truth...." Thus, any error in denying Morrow's request for surrebuttal argument was harmless beyond a reasonable doubt.[8]

### VI.

■ Finally, we address the claims Morrow raises in his pro se brief. Morrow claims that the prosecutor used the "indictment process ... unjustly" because he only sought an indictment after Morrow rejected the State's plea offer. But Morrow does not cite to any part of the record or any legal authority to support his claim. Therefore we will not consider this claim. *State v. Bartylla,* 755 N.W.2d 8, 22 (Minn. 2008) (stating that our court "will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority").

■ Morrow also claims that he was prejudiced by the fact that the State elicited testimony regarding the capabilities of the firearm and bullets that he used to

shoot at Rivera and his two friends. This argument plainly lacks merit. The fact that Morrow used a very dangerous weapon is circumstantial evidence that is probative of Morrow's intent to kill. Lastly, Morrow claims that because G.C. testified at trial that he felt there was going to be a "fight for his life," Morrow acted in self-defense and that, alternatively, it demonstrates reasonable doubt as to the existence of premeditation. We read these claims as asserting that there was insufficient evidence of Morrow's guilt. These claims also lack merit. After our careful review of the record, we conclude that the State presented ample evidence to establish that Morrow acted with premeditation and did not act in self-defense.

Affirmed.

WRIGHT, J., took no part in the consideration or decision of this case.

LILLEHAUG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

---

8. Morrow also argues that the cumulative effect of the errors that occurred at trial requires that he be granted a new trial. "We have held, in rare cases, that the cumulative effect of trial errors can deprive a defendant of his constitutional right to a fair trial when the 'errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased jury.' " *State v. Davis,* 820 N.W.2d 525, 538 (Minn.2012) (quoting *State v. Hill,* 801 N.W.2d 646, 659 (Minn.2011)). We conclude that the cumulative effect of any errors or indiscretions in this case does not require a new trial.