STATE OF MINNESOTA

IN SUPREME COURT

A15-1713

Anoka County                                                                    Hudson, J.

State of Minnesota,

              Respondent,

vs.                                                                Filed:  February 1, 2017
                                                          Office of Appellate Courts
Adam John Lilienthal,

              Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Anthony C. Palumbo, Anoka County Attorney, Kelsey R. Kelley, Assistant Anoka County Attorney, Anoka, Minnesota, for respondent.

Robert D. Sicoli, Sicoli Law, Ltd., Minneapolis, Minnesota; and

Anthony M. Bussa, Bussa Law, LLC, Minneapolis, Minnesota, for appellant.
_____

S Y L L A B U S

1.      The district court did not commit plain error in admitting evidence of appellant's post-arrest, pre-*Miranda* silence during the State's case-in-chief.

2.      Any error by the district court in permitting the State to discuss appellant's post-arrest, pre-*Miranda* silence in closing argument was harmless.

1

3.    The district court did not abuse its discretion in denying appellant's request to give a jury instruction on defense of dwelling.

Affirmed.

O P I N I O N

HUDSON, Justice.

Following a jury trial, appellant Adam John Lilienthal was convicted of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2016), and sentenced to life in prison without the possibility of release. On appeal, Lilienthal contends that the district court committed reversible error when it admitted evidence of his post-arrest, pre-*Miranda* silence during the State's case-in-chief, when it allowed the prosecutor to discuss Lilienthal's silence in closing argument, and when it denied his request for a defense-of-dwelling jury instruction. Because we conclude that the district court did not commit reversible error, we affirm.

I.

Adam Lilienthal and Scott Yorek met through a mutual friend in February 2014. After learning that Yorek needed a place to stay, Lilienthal agreed to rent Yorek a room in his house in Andover. Yorek moved into Lilienthal's house later that month. Lilienthal and Yorek agreed that Yorek would pay $100 per week in rent, though disputes later arose as to whether and how timely those payments were made.

On June 17, 2014, Lilienthal and Yorek had a disagreement during which Lilienthal demanded that Yorek move out. Lilienthal called the police from a neighbor's house around noon to report that Yorek made threats on his life during their disagreement. The

2

responding officer spoke to Yorek, found no reason to make an arrest, and then explained to Lilienthal that if he wanted Yorek to move out, he would have to use eviction procedures. Later that afternoon, Lilienthal went to the Anoka County courthouse to initiate an eviction action and obtain a restraining order. But after being told the eviction process required the payment of a fee and a hearing, Lilienthal left the courthouse with the uncompleted paperwork and returned home.

While Lilienthal was at the courthouse, Yorek left the house for an appointment. When Yorek returned to the house later that evening, he discovered that Lilienthal had changed the locks. Yorek knocked on the door and windows in an effort to have Lilienthal allow him inside. Lilienthal, wanting Yorek to leave, called two friends to ask for help. Shortly thereafter, he called the police to report that Yorek was trying to get into his house. Lilienthal called the police again 10 minutes later and told the dispatcher that he had let Yorek into the house to retrieve his belongings, but that Yorek was unwilling to leave. The officers who responded to Lilienthal's calls spoke to Yorek and advised him to stay in his room and avoid Lilienthal if he chose to remain in the house that night. The officers then left, leaving Yorek and Lilienthal alone in the house.

The parties' versions of events diverge regarding what happened next. At trial, Lilienthal testified that he found Yorek upstairs in his rented room, talking on the phone while a lit torch was burning on the bed. Lilienthal claimed that Yorek turned toward him while grabbing for the torch, and then, Lilienthal, in fear for his life, pushed Yorek onto the bed, which started the bed on fire. The State, however, offered testimony and forensic

3

evidence to establish that Lilienthal first poured gasoline on Yorek and then lit the gasoline on fire.[1]

The parties agree that after the fire started in Yorek's room, Lilienthal left the house and got into his truck. A friend whom Lilienthal had called before the fire began arrived at the house. As Lilienthal drove away, he shouted to his friend to "[g]et out of here" because his house was on fire. Lilienthal's friend called 911 to report the fire. The person who had been on the phone with Yorek during the confrontation also called 911 to report what he believed was a life-threatening altercation between Yorek and "his landlord."

The responding officers arrived to find Yorek severely burned, lying in front of the house. Yorek told the officers, paramedics, and other witnesses that Lilienthal had thrown gasoline on him. After speaking with neighbors, the officers obtained the license plate information for Lilienthal's truck and learned that he owned a cabin in northern Minnesota. The officers disseminated a statewide broadcast of Lilienthal's license plate information in an attempt to find him.

St. Louis County Deputy Andrew Feiro received the broadcast, located the truck, and stopped the vehicle. Deputy Feiro identified Lilienthal as the sole occupant of the vehicle and placed him under arrest. The record provides no evidence to indicate that

---

[1] The State's evidence to corroborate its claim that Lilienthal threw gasoline on Yorek before lighting him on fire included: Lilienthal's clothing tested positive for gasoline; the Andover Fire Chief determined that Lilienthal used ignitable liquid and a lighter from the scene to start the fire; the lighter had Lilienthal's DNA on it; the Fire Chief's investigation found that Lilienthal poured the gasoline from a red container in his garage into a zip-tie container, then carried it to Yorek's bedroom; Yorek's mattress tested positive for gasoline; Yorek's clothing tested positive for gasoline; and Yorek told officers, paramedics, and witnesses that Lilienthal threw gasoline on him.

4

Lilienthal ever made a statement in response to his arrest, except to deny that he needed medical attention. Deputy Feiro did not interrogate Lilienthal or read him a *Miranda* warning before he drove Lilienthal to the jail in St. Louis County. At the jail, Lilienthal received a *Miranda* warning. He was later transferred to the Anoka County jail.

Yorek was taken to the Hennepin County Medical Center, but died from his injuries 2 days later. A grand jury indicted Lilienthal, charging him with one count of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1), and three counts of first-degree intentional murder while committing a felony, Minn. Stat. § 609.185(a)(3) (2016).

At various points during trial, the State referenced Lilienthal's silence while he was transported in Deputy Feiro's vehicle. First, in its case-in-chief, the State questioned Deputy Feiro about Lilienthal's post-arrest, pre-*Miranda* silence:

> Q: Now, you told us about the circumstances of the stop and arrest, the stop of the vehicle and arrest of the defendant.
> A: Yes.
> Q: Okay. Did you ever Mirandize the defendant?
> A: I did not.
> Q: Now, during the time that the defendant was in your presence, did he ever say anything about what may have happened down in Anoka County.
> A: He did not.

Notably, Lilienthal did not object to this exchange.

Second, the district court, over Lilienthal's objections, permitted the State to twice reference Lilienthal's post-arrest, pre-*Miranda* silence in its closing argument. The State noted, "He drives to extreme north St. Louis County, and when apprehended there, doesn't tell anybody anything about what happened in Anoka County." Next, the State claimed that, to accept Lilienthal's testimony that he fled in panic for his life, the jury would have

5

to believe that after the 4-hour drive to St. Louis County, "he is still sufficiently panicked to not try to provide any explanation when Feiro arrests him."

Before the case was sent to the jury, Lilienthal requested a defense-of-dwelling jury instruction. The district court denied his request. The jury found Lilienthal guilty of all counts of the indictment. The district court sentenced Lilienthal to life imprisonment without the possibility of release on the first-degree premeditated murder count. This direct appeal followed.

## II.

On appeal, Lilienthal argues that the district court erred in permitting the State to use his post-arrest, pre-*Miranda* silence during the State's direct examination of Deputy Feiro and in its closing argument. Lilienthal contends that the State's use of his silence against him at trial violated his Fifth Amendment right against self-incrimination. The State, by contrast, argues that Lilienthal's Fifth Amendment rights were not implicated because Lilienthal was never under a government-imposed compulsion to speak or remain silent because Officer Feiro did not interrogate Lilienthal. *Cf. State v. Borg*, 806 N.W.2d 535, 543 (Minn. 2011) (holding that *pre*-arrest silence does not implicate the Fifth Amendment unless the government has compelled a defendant to speak or remain silent). Lilienthal further claims that, because he objected to the use of his post-arrest, pre-*Miranda* silence immediately before the State's closing argument, all alleged Fifth Amendment violations must be reviewed for harmless error, not plain error. The State, however, argues that because Lilienthal did not object to the first mention of his silence during the State's direct examination of Deputy Feiro, Lilienthal forfeited his Fifth Amendment claims,

which means they are subject to only plain error review. Because the circumstances surrounding the alleged violations differ, our examination is not controlled by a single standard of review, and thus we consider each occurrence separately.

A.

Lilienthal first challenges the district court's admission of testimony regarding his post-arrest, pre-*Miranda* silence. The State asked Deputy Feiro, "Now, during the time that the defendant was in your presence, did he ever say anything about what may have happened down in Anoka County[?]" Deputy Feiro responded, "He did not." Lilienthal did not object to the prosecutor's question or Deputy Feiro's answer.

When a defendant fails to object at trial, the forfeiture doctrine generally precludes appellate relief. *State v. Beaulieu*, 859 N.W.2d 275, 278-79 (Minn. 2015). Lilienthal appears to argue that his objections before closing argument apply retroactively to the State's questioning of Deputy Feiro on direct examination, and thus he preserved his objection to the testimony for appeal. We disagree. We have held that an objection to the admissibility of evidence must be made at the first opportunity, and that the failure to do so forfeits the right to raise the question on appeal. *Id.* ("[A] constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make *timely* assertion of the right before a tribunal having jurisdiction to determine it." (emphasis added) (quoting *United States v. Olano*, 507 U.S. 725, 731 (1993)); *State v. Abraham*, 338 N.W.2d 264, 266 (Minn. 1983) (declining to address the defendant's claim about improper cross-examination because, in part, "defense counsel did not object until the entire series of questions had been asked and answered and did not state on the record precisely what

7

his objection was"). Therefore, we conclude that Lilienthal did not timely object to the State's questioning on direct examination.

However, Minnesota Rule of Criminal Procedure 31.02 allows appellate courts to correct forfeited errors not timely raised in district court when there is a "[p]lain error affecting a substantial right." *See Beaulieu*, 859 N.W.2d at 279. Under the plain error doctrine, the appellant must show (1) error; (2) that was plain; and (3) that affected substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). Further, "[i]f the defendant establishes these three prongs, we may correct the error only if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *State v. Washington-Davis*, 881 N.W.2d 531, 541 (Minn. 2016) (citation omitted) (internal quotation marks omitted). "An error is 'plain' if it was 'clear' or 'obvious,' " *State v. Strommen*, 648 N.W.2d 681, 688 (Minn. 2002) (citation omitted), which requires that "the error contravenes case law, a rule, or a standard of conduct," *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). Moreover, "the error must be plain at the time of the appeal." *State v. Jackson*, 714 N.W.2d 681, 690 (Minn. 2006). Under the plain error rule, "if we find that any one of the requirements is not satisfied, we need not address any of the others." *Montanaro v. State*, 802 N.W.2d 726, 732 (Minn. 2011). Although Lilienthal did not object to Deputy Feiro's testimony regarding his post-arrest, pre-*Miranda* silence, we will review his claim under the plain error doctrine. In doing so, we conclude that Lilienthal failed to establish that the alleged error was plain.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in a criminal case to be a witness against himself." U.S. Const. amend.

8

V.[2] Both parties correctly acknowledge that, at the time of this appeal, neither the Supreme Court nor our court has addressed whether the Fifth Amendment prohibits the State's use of a defendant's post-arrest, pre-*Miranda* silence in its case-in-chief.[3] In a similar case, we concluded that the unobjected-to admission of a defendant's pre-arrest silence was not plain error. In *State v. Jones*, 753 N.W.2d 677, 688 (Minn. 2008), the appellant argued that the prosecutor had used his pre-arrest silence in violation of the Fifth Amendment. In *Jones*, we noted that neither the Supreme Court nor our court had yet addressed the Fifth Amendment implications of pre-arrest silence, and that the federal circuit courts were split on the question. *Id.* at 688-89. Accordingly, we concluded that "[b]ecause neither this court nor the federal courts have conclusively resolved this issue, we cannot say that the

---

[2]    The State argues that Lilienthal's Fifth Amendment rights were not implicated because Lilienthal was never under a government-imposed compulsion to speak or remain silent because Officer Feiro did not interrogate Lilienthal. *Cf. Borg*, 806 N.W.2d at 543. But we need not address this argument because even if the district court erred in allowing the State to use Lilienthal's post-arrest, pre-*Miranda* silence, the error was not plain.

[3]    *But see Salinas v. Texas*, __ U.S. __, __133 S. Ct. 2174, 2181 (2013) (declining, for a pre-arrest interview, "to craft a new exception to the 'general rule' that a witness must assert the privilege to subsequently benefit from it" (citation omitted)). *Salinas*, though pre-arrest, is the Court's most recent instruction on the conditions for invoking the Fifth Amendment. Because Salinas had not expressly invoked his Fifth Amendment privilege, a three-justice plurality did not address whether the conduct violated the Fifth Amendment. *Id.* at __, 133 S. Ct. at 2181-84. However, two concurring justices reached the Fifth Amendment claim, writing that Salinas's claim "would fail even if he had invoked the privilege because the prosecutor's comments regarding his precustodial silence did not compel him." *Id.* at __, 133 S. Ct. at 2184 (Thomas, Scalia, JJ., concurring). As the split vote in *Salinas* demonstrates, the law in this area is anything but plain, even though the result in *Salinas* was that the defendant was not entitled to relief under the Fifth Amendment.

9

prosecutor 'contravene[d] case law, a rule, or a standard of conduct' " to meet the requirements of plain error review. *Id.* at 689 (citation omitted).

Similarly, neither the Supreme Court nor our court has addressed the issue Lilienthal asks us to address here: whether the State's case-in-chief use of post-arrest, pre-*Miranda* silence is prohibited by the Fifth Amendment. As in *Jones*, the federal circuit courts are evenly split on the issue presented here. *Compare United States v. Velarde-Gomez*, 269 F.3d 1023 (9th Cir. 2001), *United States v. Moore*, 104 F.3d 377 (D.C. Cir. 1997), *and United States v. Hernandez*, 948 F.2d 316 (7th Cir. 1991), *with United States v. Frazier*, 408 F.3d 1102 (8th Cir. 2005), *United States v. Rivera*, 944 F.2d 1563 (11th Cir.1991), *and United States v. Love*, 767 F.2d 1052 (4th Cir. 1985). Therefore, the district court's admission of Deputy Feiro's testimony regarding Lilienthal's post-arrest, pre-*Miranda* silence did not squarely contravene case law, a rule, or a standard of conduct, and accordingly does not constitute plain error. Having concluded that any alleged error by the district court was not plain, we need not consider any of the other prongs of plain error review with respect to the State's direct examination of Deputy Feiro.

B.

Turning to the second instance of alleged error at trial, Lilienthal claims that the district court erred in overruling his objection to the State's use of his post-arrest, pre-*Miranda* silence during its closing argument. After the district court ruled that the State was permitted to use the silence during its closing, the State mentioned Lilienthal's silence twice. First, the prosecutor noted, "He drives to extreme north St. Louis County, and when apprehended there, doesn't tell anybody anything about what happened in Anoka County."

10

Second, the prosecutor argued that to accept Lilienthal's testimony that he fled in panic for his life, the jury would have to believe that after a 4-hour drive, "he [was] still sufficiently panicked to not try to provide any explanation when Feiro arrest[ed] him."

When a defendant has objected to an alleged error, the harmless-error standard applies. *State v. Matthews*, 800 N.W.2d 629, 633 (Minn. 2011); *see* Minn. R. Crim. P. 31.01. "When an error implicates a constitutional right, we will award a new trial unless the error is harmless beyond a reasonable doubt." *State v. Davis*, 820 N.W.2d 525, 533 (Minn. 2012). To be harmless beyond a reasonable doubt, the jury's verdict must be "surely unattributable to the error." *Id.* (citation omitted) (internal quotation marks omitted). In evaluating whether an error was harmless, we will not "analyze whether a jury would have convicted the defendant without the error," but will instead "look[] to whether the error reasonably . . . impacted upon the jury's decision." *State v. Juarez*, 572 N.W.2d 286, 292 (Minn. 1997).

In this case, we need not determine whether the district court violated Lilienthal's Fifth Amendment rights in permitting the State to reference Lilienthal's post-arrest, pre-*Miranda* silence in its closing argument because we conclude that the alleged error was harmless beyond a reasonable doubt. We reach this conclusion for two reasons. First, the overwhelming weight of the affirmative evidence presented by the State in support of its theory that Lilienthal threw gasoline on Yorek suggests that the jury's verdict was surely unattributable to the two references to Lilienthal's silence in the State's closing. Second, the apparent purpose of the State's use of Lilienthal's post-arrest, pre-*Miranda* silence in closing argument was to question the reasonableness and credibility of his testimony, not

11

to provide independent, substantive evidence of guilt. Accordingly, we conclude that the two brief references to Lilienthal's post-arrest, pre-*Miranda* silence during closing argument were harmless beyond a reasonable doubt.

In sum, we conclude there was no reversible error in connection with the State's use of Lilienthal's post-arrest, pre-*Miranda* silence at trial. Any error in admitting Lilienthal's silence during the State's direct examination of Deputy Feiro was not plain. In addition, any error in permitting the State to use Lilienthal's post-arrest, pre-*Miranda* silence in its closing argument was harmless beyond a reasonable doubt.

III.

Lilienthal next challenges the district court's refusal to give a defense-of-dwelling jury instruction. We analyze the failure to give a jury instruction under an abuse of discretion standard. *State v. Ndikum*, 815 N.W.2d 816, 818 (Minn. 2012). Because Lilienthal objected to the district court's refusal to give a defense-of-dwelling instruction, his challenge is properly preserved for appeal.

"A defendant is entitled to an instruction on his theory of the case if there is evidence to support it." *State v. Pendleton*, 567 N.W.2d 265, 270 (Minn. 1997). Minnesota law permits the use of deadly force to "prevent[] the commission of a felony in the actor's place of abode." Minn. Stat. § 609.065 (2016). In determining whether evidence exists to support a defense-of-dwelling jury instruction, the district court must "review the record in the light most favorable to the party requesting the instruction." *State v. Dahlin*, 695 N.W.2d 588, 598 (Minn. 2005). The parties dispute whether Lilienthal was entitled to a defense-of-dwelling instruction. We conclude that he was not.

12

"[W]hen the defendant and the victim reside in the same dwelling, the defendant cannot raise the defense of dwelling defense." *State v. Hare*, 575 N.W.2d 828, 832 (Minn. 1998); *see State v. Glowacki*, 630 N.W.2d 392, 401 (Minn. 2001). Because defense of dwelling cannot be asserted against those with "rights to the dwelling," *Glowacki*, 630 N.W.2d at 401, the question before us is whether, when viewed in a light most favorable to Lilienthal, the evidence supported a finding that Yorek had a right to possess the dwelling at the time of the fire. The State argues that the evidence did not support the instruction because Yorek had a right to possess the dwelling under applicable Minnesota law. Lilienthal disagrees, arguing that the evidence presented at trial supported a finding that Yorek was not a tenant at the time of the confrontation, and therefore had no "rights to the dwelling" that would preclude the instruction.

Minnesota law defines a tenancy at will as "a tenancy in which the tenant holds possession by permission of the landlord but without a fixed ending date." Minn. Stat. § 504B.001, subd. 13 (2016). Lilienthal testified that the "rent arrangement was . . . $100 a week, and I told him it wouldn't be a super long term renting basis, but he could stay for a little while." Therefore, the record supports that Yorek had a tenancy at will.

Lilienthal makes two arguments to support his contention that Yorek's tenancy, and therefore rights to the dwelling, had ceased by the time of the fire, which would permit Lilienthal to assert a defense-of-dwelling defense. Lilienthal first argues that Yorek's tenancy terminated when Lilienthal expressed that he did not want Yorek to continue living there after their morning confrontation on the day of the fire. Lilienthal secondarily claims that because Yorek had not paid rent in a while, Yorek no longer had rights to the dwelling.

13

Terminating a tenancy at will, for any reason by either party, requires "notice in writing" at least as far in advance as "the interval between the time rent is due or three months, whichever is less." Minn. Stat. § 504B.135(a) (2016). Lilienthal testified that the rent was due each week, making this the required notice interval. Terminating a tenancy at will specifically due to a tenant's neglect or refusal to pay rent requires that the landlord "giv[e] the tenant 14 days notice to quit in writing." Minn. Stat. § 504B.135(b) (2016).

Both of Lilienthal's arguments fail because the record contains no evidence that Lilienthal provided notice in writing to Yorek to terminate the tenancy. Under either subdivision—Minn. Stat. § 504B.135(a) or (b)—Lilienthal was required to provide written notice to Yorek of his intent to terminate the tenancy. Viewed in the light most favorable to Lilienthal, the only interaction that could be described as notice occurred after their morning altercation on the day of the fire, when Lilienthal asked Yorek, "Is there a chance you can leave?" Even this "notice," however, does not meet the statutory requirements both because it was not timely and because it was not in writing. Thus, even when viewed in a light most favorable to Lilienthal, the record does not contain any evidence that Lilienthal provided the requisite written notice to Yorek within the timeframe required by either statutory provision to terminate the tenancy. Thus, Yorek's tenancy and rights to the dwelling had not ceased by the time of the fire.

In sum, we conclude that the district court did not abuse its discretion in refusing to give a defense-of-dwelling jury instruction.

Affirmed.

14