*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-1035**

State of Minnesota,
Respondent,

vs.

Demetrius Antonio Wynne,
Appellant.

**Filed April 15, 2024**
**Affirmed**
**Ede, Judge**

Hennepin County District Court
File No. 27-CR-19-28696

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Anna R. Light, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Tyler Bliss, Minneapolis, Minnesota (for appellant)

Considered and decided by Reyes, Presiding Judge; Larson, Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**EDE**, Judge

In this direct appeal from a second-degree murder conviction following a jury trial and postconviction proceedings, appellant challenges his conviction and the postconviction court's denial of his petition without an evidentiary hearing. Appellant argues that the district court erroneously admitted excessive spark-of-life evidence and abused its

discretion by denying appellant's motions for a mistrial and his motion for judgment of acquittal, or a new trial. Appellant also contends that the postconviction court erred by summarily denying his petition, maintaining that his trial counsel rendered ineffective assistance by failing to present evidence of alternative perpetrators. We affirm.

**FACTS**

*Murder Investigation*

This case arises from a murder that occurred in Minneapolis in July 2015. Minneapolis Police Department (MPD) officers responded to the victim's residence after receiving a call from her son. The officers found the victim "deceased in her bedroom[,] surrounded by large amounts of dried blood." The victim had a broken jaw, signs of strangulation, and five stab wounds. A medical examiner determined that the victim's death was caused by complex homicidal violence. Because a window screen had been cut and removed, law enforcement determined that the assailant's likely point of entry was a window located at the rear of the victim's home.

Officers canvassed the neighborhood and interviewed a woman who lived in a residence located directly to the south of the victim's home. The woman informed officers that she lived at the residence with her daughter and two sons. Both of the woman's sons were present for the interview; one was later identified as appellant Demetrius Antonio Wynne. In June 2019, the Minneapolis Crime Lab identified fingerprint impressions recovered from the victim's kitchen window and from the rear window of the victim's residence—the latter of which police had determined to be where the assailant accessed the victim's home—as belonging to Wynne. A forensic scientist from the Minnesota Bureau

2

of Criminal Apprehension (BCA) also matched Wynne's DNA profile to a partial male profile recovered from the victim's fingernail clippings.

***Charges and Pretrial Proceedings***

Respondent State of Minnesota charged Wynne with one count of second-degree murder with intent—not premeditated, in violation of Minnesota Statutes section 609.19, subdivision 1(1) (2014), and one count of second-degree murder without intent—while committing a felony, in violation of Minnesota Statutes section 609.19, subdivision 2(1) (2014).

Wynne first raised alternative-perpetrator evidence at a pretrial evidentiary hearing in June 2021. At the hearing, Wynne moved for a continuance, alleging that evidence of alternative perpetrators "ha[d] come to light . . . including people the victim might have called the police on" and "the potential of a third-party perpetrator who was in a dark truck behind [the victim's] home." Wynne supplemented his request for a continuance with an affidavit identifying "kids in the neighborhood turning on fire hydrants" and a "black (dark) truck behind the victim's home on the night of her death" as potential alternative perpetrators. The district court granted the continuance.

In September 2021, Wynne filed a motion notifying the district court of his intent to assert the alternative-perpetrator defense. The motion listed seven potential alternative perpetrators: "1. [S.C.]; 2. [M.H.]; 3. [J.A.T.]; 4. [S.T.]; 5. hooded man turning doorknobs; 6. kids not from the neighborhood; and 7. Peeping Tom." The state opposed Wynne's motion, arguing (1) that Wynne had not satisfied his burden of providing evidence

inherently connecting any third party to the victim's murder; and (2) that the district court should exclude the evidence because it would mislead and confuse the jury.

The district court denied Wynne's motion to admit alternative-perpetrator evidence, subject to review after an offer of proof. The district court reasoned that Wynne had not yet made a requisite showing that the proposed evidence had an inherent tendency to connect an alternative perpetrator to the charges.

### Jury Trial

The matter proceeded to a jury trial, which lasted seven days. In its case-in-chief, the state presented testimony from: the victim's son; the MPD officer who responded to the scene; two MPD sergeants who investigated the murder; two MPD forensic scientists; an MPD crime lab manager; two BCA forensic scientists; and a former assistant medical examiner. The defense called the following witnesses: Wynne's mother; Wynne's father;[1] Wynne's sister; G.S., who was a neighbor of both Wynne and the victim; a friend of Wynne's family; and Wynne. In rebuttal, the state called the owner of the residence that Wynne and his mother lived in at the time of the murder. For present purposes, we summarize the following salient portions of the trial proceedings.

#### Spark-of-Life Evidence

The state opened its case with testimony from the victim's son about the victim's life. The victim's son told the jury that the victim was an artist and gardener, and he

---

[1] The witness acknowledged during cross-examination that he is not Wynne's biological father, but rather views himself as Wynne's father because he raised Wynne since Wynne was a child.

described the victim as a "vibrant woman" who was compassionate, loving, and caring. The state questioned the victim's son, without objection, about childcare that the victim had provided for one of her grandchildren:

> THE STATE: Did [the victim] also provide daycare for your family?
> VICTIM'S SON: For our youngest at the time, yeah. He was just under 1-year-old. And, yes, he was—or she was doing daycare for us Tuesdays and Thursdays.
> THE STATE: How old is that child now?
> VICTIM'S SON: Now almost 7.
> THE STATE: And did your—did your two youngest children even meet grandma?
> VICTIM'S SON: No.
> . . . .
> THE STATE: Are you an only child?
> VICTIM'S SON: Correct.

The victim's son explained that he learned of the victim's death when he arrived at the victim's home to drop off his child. The victim's son called the police to conduct a welfare check after the victim did not answer the door, and the police discovered the victim's body when they entered the victim's house.

In addition, without objection from the defense, the district court received into evidence two photographs of the victim. One photograph was taken on Mother's Day and the other was taken on the victim's son's wedding day.

### Alternative-Perpetrator Evidence

While cross-examining an investigating sergeant, Wynne elicited testimony that his mother had advised law enforcement about a neighbor who said he "saw some suspicious activity." The state objected on hearsay grounds, prompting a conference between the parties and the district court, outside the jury's presence. Wynne's trial counsel made an

5

offer of proof that the testimony he sought concerned information from the neighbor about a "suspicious vehicle in [the] back of" the victim's home. At first, Wynne's trial counsel asserted that he sought not to offer the testimony for alternative-perpetrator purposes but to establish "how thorough was the investigation" and whether "other parties [were] pursued."

The district court determined that the only reason the proffered evidence would be relevant is if it supported an alternative-perpetrator theory. The district court heard argument from the parties about whether there was an inherent tendency of the evidence to connect an alternative perpetrator to the crime or whether its relevance was outweighed by the risk of misleading the jury. After considering the parties' positions, the district court ruled that the evidence related to the suspicious vehicle was admissible if it first came in through the neighbor's testimony.

At the state's request, the district court inquired further of Wynne's intention to offer other alternative-perpetrator evidence at trial. In response, Wynne's trial counsel provided an offer of proof that the victim had called the police about an unidentified group of kids who had repeatedly tampered with a nearby fire hydrant, including on the night of the murder. After the state disclosed that there was no evidence of any direct interaction between the victim and the alleged group of kids, the district court determined that Wynne's offer of proof was insufficient and that the evidence was therefore inadmissible.

Wynne's trial counsel also made an offer of proof about "Peeping Tom" evidence, asserting that a neighbor had witnessed an individual "pulling on doors and trying doors" on the night of the murder. When the district court asked for more details, Wynne's trial

6

counsel said that there were police reports of the "Peeping Tom" incident, although he did not have the report in his possession at the time. Wynne maintained that "there was a hooded man" who "might also be described as" the "Peeping Tom," and "there was a different description of a hooded man grabbing doorknobs" who "may or may not be the same Peeping Tom." The district court declined to rule that the "Peeping Tom" evidence was admissible and instead ordered that Wynne produce the purported police reports to provide an accurate offer of proof. The state later informed the district court that it "look[ed] for a police report related to the Peeping Tom," but could not "find anything." And Wynne's trial counsel likewise reported that he could not locate a police report discussing the "Peeping Tom."

Finally, Wynne's trial counsel informed the district court that he planned to ask the responding officers about their investigation into a confrontation between the victim and her former boyfriend. The district court ruled the evidence was inadmissible as there was "nothing connecting [the victim's former boyfriend] with the scene that night[.]"

After resuming cross-examination of the investigating sergeant, Wynne elicited testimony that officers "learned of a vehicle that was in the alley early morning" on the day that the murder was discovered. When asked whether officers pursued the matter during their investigation, the sergeant said there was not enough information provided to "pursue that angle."

The next day of trial, the district court and the parties again discussed alternative-perpetrator evidence and offers of proof that Wynne's trial counsel had filed in the interim. The district court ruled that a statement that "an unknown white male" said that "somebody

7

was turning doorknobs" was inadmissible hearsay. The district court also concluded that a statement that the victim's relationship with her ex-boyfriend ended badly in a violent argument was inadmissible, reasoning that there was nothing connecting the victim's ex-boyfriend to the crime scene and, even assuming such a connection, the proffered facts would not meet the reverse-*Spreigl*[2] balancing test of undue prejudice versus probative value. Lastly, the district court declined to admit evidence of a statement from a person named D.R. that he heard from a man named Rico that another man named J.T. was possibly involved in the murder. The district court reasoned that D.R.'s statement was inadmissible because it involved two levels of hearsay and neither Rico nor J.T. were available and subject to cross-examination.

During the defense's case, Wynne's counsel examined Wynne's and the victim's neighbor, G.S., who testified that, around the time of the murder, he woke up early to take his dogs outside. G.S. recalled: "I noticed that when I turned lights on and opened the back door, lights shut off in the alleyway." G.S. said he "[d]idn't hear any noises, didn't hear any break-ins, [and] didn't see anybody moving around," but he did see an SUV "sitting in the alleyway" that "may have been behind [the victim's] house[.]" The lights were shut off on the SUV, and G.S. did not observe any people or hear any noises around the vehicle. G.S. could not identify the SUV's license plate, nor could he identify its make and model.

---

[2] *See State v. Spreigl*, 139 N.W.2d 167 (Minn. 1965); *see also Huff v. State*, 698 N.W.2d 430, 438 (Minn. 2005) (discussing the parameters of reverse-*Spreigl* evidence).

### *Motions for Mistrial*

During the state's case-in-chief, the district court admitted an audio recording of a statement law enforcement took from Wynne and provided the jury with a copy of the transcript as a court exhibit to aid them in listening to the recording. After a few minutes, Wynne asked to pause the playing of the audio exhibit and the parties discussed the defense's concern about references in the recording and transcript that suggested Wynne had been arrested for and accused of another crime. Wynne moved for a mistrial, arguing that, by playing the audio exhibit and providing the transcript suggesting that Wynne had been arrested for and accused of another crime, the state violated the district court's pretrial ruling excluding references to Wynne's prior criminal history. Wynne contended that he could not receive a fair trial because of what the jury heard on the recording and read in the transcript. The state opposed, and the district court denied Wynne's mistrial motion, finding that redacting the challenged references from the transcript, replaying the audio for the jury without the objectionable portions, and ordering the jury to disregard the excised material was sufficient to cure any prejudice.

Later, when the state cross-examined Wynne during his testimony in the defense's case, the state asked Wynne if he was "in jail" in 2019. Wynne responded by asking, "What, are you talking about right now?" Wynne's counsel then objected before the state questioned Wynne further. Following a bench conference, the district court ordered the jury to disregard the state's question and directed the state to move on. After the district court excused the jury for the day, Wynne again moved for a mistrial based on the state's question about whether Wynne was in jail in 2019. The state opposed, and the district court

9

denied Wynne's motion, based on its instruction that the jury disregard the state's question and its assessment that the prejudicial effect of the state's question was minimal.

The jury found Wynne guilty of second-degree murder with intent—not premeditated, and found Wynne not guilty of second-degree murder without intent—while committing a felony.

### *Motion for Judgment of Acquittal, or a New Trial, and Sentencing*

Before the sentencing hearing, Wynne filed a motion for judgment of acquittal, or a new trial, raising arguments about the interests of justice, irregularities in the proceedings, prosecutorial misconduct, newly discovered evidence, errors of law at trial, and a guilty verdict that was "not justified by the evidence" or was contrary to law. The state opposed, and the district court denied Wynne's motion.

The district court sentenced Wynne to 324 months in prison.

### *Appeal and Postconviction Petition*

Wynne appealed the district court's judgment of conviction. Wynne later moved to stay his appeal to pursue postconviction relief in the district court. We granted the motion to stay. Wynne then petitioned for postconviction relief, arguing that he received ineffective assistance of counsel at trial because his counsel failed to raise an alternative-perpetrator defense. The postconviction court filed an order summarily denying the petition without an evidentiary hearing.

This reinstated appeal follows.

**DECISION**

Wynne challenges the district court's admission of spark-of-life evidence, denial of his motions for a mistrial, and denial of his motion for judgment of acquittal, or a new trial. Wynne also maintains that the postconviction court erred in summarily denying his petition. We address each argument in turn.

## I. The district court did not plainly err by admitting spark-of-life evidence.

Wynne asserts that the district court abused its discretion by admitting two photographs and a colloquy about the victim's life, which Wynne contends was excessive spark-of-life evidence. The state responds that the subject spark-of-life evidence "clearly falls within the 'leeway' the prosecutor has under the law to provide the jury with some information regarding the victim's life," and that the evidence was relevant to establish why the victim's son was at the victim's home the morning her body was discovered. Because of the discrete nature and brevity of the spark-of-life evidence, as well as its relevance to the discovery of the crime, we agree with the state.

"Evidentiary rulings rest within the sound discretion of the district court, and [appellate courts] will not reverse an evidentiary ruling absent a clear abuse of discretion." *State v. Ali*, 855 N.W.2d 235, 249 (Minn. 2014). "When a defendant fails to object at trial, the forfeiture doctrine generally precludes appellate relief." *State v. Lilienthal*, 889 N.W.2d 780, 784 (Minn. 2017). "Minnesota Rule of Criminal Procedure 31.02, however, creates an exception to the forfeiture doctrine that allows an appellate court to consider a forfeited error when the defendant establishes (1) an error, (2) that was plain, and (3) that affected the defendant's substantial rights." *State v. Webster*, 894 N.W.2d 782, 786 (Minn. 2017)

(citing *Lilienthal*, 889 N.W.2d at 785). "An error is plain if it was clear or obvious, which requires that the error contravenes case law, a rule, or a standard of conduct[.]" *Lilienthal*, 889 N.W.2d at 785 (quotations and citations omitted). "If all three conditions are met, this court may correct the error only if it seriously affects the fairness, integrity, or reputation of judicial proceedings." *State v. Modtland*, 970 N.W.2d 711, 723 (Minn. App. 2022), *rev. granted in part* (Apr. 27, 2022), *rev. denied* (Mar. 14, 2023). "If [the appellate court] conclude[s] that any prong of the plain error analysis is not satisfied, [the court] need not consider the other prongs." *State v. Brown*, 815 N.W.2d 609, 620 (Minn. 2012).

Reasoning that a "victim was not just bones and sinews covered with flesh, but was imbued with the spark of life[,]" the Minnesota Supreme Court has held that "[t]he prosecution has some leeway to show that spark and present the victim as a human being." *State v. Morrow*, 834 N.W.2d 715, 726–27 (Minn. 2013) (alteration in original) (quoting *State v. Graham*, 371 N.W.2d 204, 207 (Minn. 1985)). "The [s]tate may present spark of life evidence so long as it is not an attempt to invoke undue sympathy or inflame the passions of the jury." *Id.* at 727 (citation omitted).

Here, we conclude that the district court did not contravene case law, a rule, or a standard of conduct by admitting, without objection, two photographs and brief testimony as spark-of-life evidence during a seven-day trial. *See Lilienthal*, 889 N.W.2d at 785. This is because the circumscribed nature of the spark-of-life evidence does not evince an attempt to invoke undue sympathy or inflame the passions of the jury. *See Morrow*, 834 N.W.2d at 727.

12

The Minnesota Supreme Court's decision in *State v. Scales*, 518 N.W.2d 587 (Minn. 1994), is instructive. In *Scales,* the supreme court held that the district court did not err in admitting three photographs of the victim, "where the photographs were used to provide background information about the family and to personalize [the victim] and the number of photographs used for these purposes was small." 518 N.W.2d at 593. Similarly, in *Morrow*, the supreme court held that the district court did not err by admitting a childhood photograph of the murder victim and a testifying witness who was also involved in the shooting incident. 834 N.W.2d at 727. The appellant in *Morrow* argued that the photograph was prejudicial because it undermined his claim of self-defense and defense of others. *Id.* The *Morrow* court reasoned that "the picture was briefly presented," and that the jury also heard testimony from the witness, saw photographs of the victim's body, and "heard testimony about [the victim's] stature," such that "it [was] unreasonable to conclude that the jury considered the childhood photograph when evaluating Morrow's justification defenses." *Id.*

Wynne cites *State v. Hodgson*, 512 N.W.2d 95 (Minn. 1994), in support of his argument. But in *Hodgson*, the supreme court held that it was not error for the district court to admit a 45-second video of the victim playing basketball for his high school basketball team. 512 N.W.2d at 97. Not only did the evidence present the victim as a human being, but it was also relevant to the defense's theory that the defendant's ex-girlfriend committed the murder because the video "showed that the victim was tall, well-built, agile and athletic, *i.e.*, not someone that a smaller, less agile person . . . likely would be able to stab to death . . . ." *Id.* at 97-98.

13

As discussed above, the spark-of-life evidence here consists of two photographs and testimony that amounts to roughly four pages of the trial transcript. The evidence presented the victim as a human being and was relevant to the discovery of the murder by the victim's son. We therefore conclude that the admission of spark-of-life evidence did not contravene Minnesota case law upholding the admissibility of similar evidence that is brief and relevant to the charged crime. *See, e.g.*, *State v. Evans*, 756 N.W.2d 854, 878-79 (Minn. 2008) (citing *Hodgson* and holding that the appellant's "right to a fair trial was not violated because of the spark-of-life evidence" that "does not appear to have been an attempt to get the jury to decide the issue based on passion or prejudice" and that "was relevant to an issue in the case"). Because we discern no clear or obvious error based on contravention of case law, a rule, or a standard of conduct, Wynne has failed to satisfy the plain-error analysis. *See Lilienthal*, 889 N.W.2d at 785; *Webster*, 894 N.W.2d at 786; *Brown*, 815 N.W.2d at 620.

## II. The district court did not abuse its discretion by denying Wynne's motions for a mistrial.

Wynne argues that the district court abused its discretion when it denied his motions for a mistrial. We disagree.

"The denial of a motion for a mistrial is reviewed for an abuse of discretion." *State v. Griffin*, 887 N.W.2d 257, 262 (Minn. 2016). "A mistrial should be granted only if there is a reasonable probability, in light of the entirety of the trial including the mitigating effects of a curative instruction, that the outcome of the trial would have been different had the incident resulting in the motion not occurred." *Id.* "The trial judge is in the best position to

determine whether an error is sufficiently prejudicial to require a mistrial or whether another remedy is appropriate." *Id.*

Wynne first moved for a mistrial after the jury heard an audio recording of a statement law enforcement took from Wynne and received a copy of the transcript of the recording. Portions of the audio recording and transcript suggested that Wynne had been arrested for and accused of a crime other than the charged murder. The district court denied Wynne's motion and instead provided a redacted transcript to the jury, replayed the audio recording without the objectionable portions, and ordered the jury to disregard the excised material. Wynne also moved for a mistrial following his objection to the state's cross-examination of Wynne, specifically when the prosecutor asked if Wynne was in jail in 2019. The district court ordered the jury to disregard the state's question and directed the state to move on, and the district court denied Wynne's mistrial motion.

On appeal, Wynne does not explain how the outcome of the trial would have been different without the objectionable audio recording, transcript, and cross-examination. And, considering the entire trial, including the mitigating effects of the district court's curative instructions, we cannot say that there is a reasonable probability that the outcome would have been different without the objectionable incidents Wynne has identified. *See id.*

Indeed, the state presented strong evidence of Wynne's guilt. An MPD forensic scientist testified about fingerprint evidence identifying Wynne that law enforcement located both on the victim's kitchen window and on a rear window of the victim's residence, the latter of which police determined to be the assailant's likely point of entry.

15

Moreover, a BCA forensic scientist testified that she matched Wynne's DNA profile to the partial male profile recovered from the victim's fingernail clippings. And the district court provided curative instructions to the jury in both instances underlying Wynne's motions for mistrial. When a district court instructs a jury—including instructions to disregard an improper question—appellate courts "presume the jurors followed the instruction." *Id.*; *see also State v. Segura*, 2 N.W.3d 142, 167 (Minn. 2024) (stating that appellate courts "presume that juries follow instructions given by the district court").

Given all the trial evidence, together with the district court's curative instructions, we conclude that the district court did not abuse its discretion in determining that any error was not sufficiently prejudicial to require a mistrial and that no other remedy was appropriate. *See id.*

**III.    Wynne has waived any assignment of error about the district court's denial of his motion for judgment of acquittal, or a new trial.**

Wynne contends that the district court erred when it denied his motion for judgment of acquittal, or a new trial. But Wynne cites no legal authority and provides no argument to support his assertion. "An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection." *State v. Andersen*, 871 N.W.2d 910, 915 (Minn. 2015) (*Andersen I*) (quotation omitted).

Because Wynne did not adequately brief the issue, and because we discern no prejudicial error that is obvious on mere inspection, Wynne has waived this argument and we will not consider it. *See id.*

16

**IV. The postconviction court did not abuse its discretion by summarily denying Wynne's petition.**

Wynne maintains that the postconviction court abused its discretion by denying his petition without a hearing. Wynne claims that his trial counsel provided him ineffective assistance because counsel "had evidence of alternative perpetrators that was not presented at trial due to disorganization and not strategy." The state responds that Wynne was not entitled to an evidentiary hearing because his ineffective-assistance-of-counsel claim amounted to argumentative assertions without factual support. As explained below, we conclude that Wynne's arguments are unavailing.

A petition for postconviction relief must contain "a statement of the facts and the grounds upon which the petition is based and the relief desired." Minn. Stat. § 590.02, subd. 1(1) (2022). The postconviction court must set a hearing on the petition "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief[.]" Minn. Stat. § 590.04, subd. 1 (2022). "In determining whether an evidentiary hearing is required, a postconviction court considers the facts alleged in the petition as true and construes them in the light most favorable to the petitioner." *Andersen v. State*, 913 N.W.2d 417, 422–23 (Minn. 2018) (*Andersen II*) (quotation omitted). "Any doubts about whether to conduct an evidentiary hearing should be resolved in favor of the defendant seeking relief." *State v. Nicks*, 831 N.W.2d 493, 504 (Minn. 2013). But "[i]f the postconviction court concludes there are no material facts in dispute that preclude dismissal, and the [s]tate is entitled to dismissal of the petition as a matter of law, the court is not required to hold an evidentiary hearing." *Id.* at 506 (quotation omitted).

17

More specifically as to this matter, "[t]o be entitled to an evidentiary hearing on an ineffective-assistance-of-counsel claim, an appellant must allege facts that, if proven by a fair preponderance of the evidence," satisfy the two-prong *Strickland* test.[3] *Chavez-Nelson v. State*, 948 N.W.2d 665, 671 (Minn. 2020) (quotation omitted). The first prong of the *Strickland* test is that "the defendant must prove that counsel's representation fell below an objective standard of reasonableness." *Nicks*, 831 N.W.2d at 504. The second prong requires that "the defendant . . . prove there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* "An appellant asserting a claim of ineffective assistance of counsel bears the burden of proof on that claim." *State v. Jackson*, 726 N.W.2d 454, 463 (Minn. 2007).

"We review a postconviction court's summary denial of a petition for postconviction relief for an abuse of discretion." *Andersen II*, 913 N.W.2d at 422. The postconviction court abuses its discretion if its decision "is based on an erroneous view of the law or is against logic and the facts in the record." *Brown v. State*, 895 N.W.2d 612, 617 (Minn. 2017) (quotation omitted). "Because claims of ineffective assistance of counsel are mixed questions of law and fact, we review the postconviction court's legal conclusions . . . de novo." *Nicks*, 831 N.W.2d at 503. And we review the postconviction court's factual findings for clear error. *See id.*

Here, we are persuaded that the postconviction court did not abuse its discretion by summarily denying Wynne's petition because Wynne did not allege facts in support of his

---

[3] *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

18

ineffective-assistance-of-counsel claim that, if proven by a fair preponderance of the evidence, satisfy the two-prong *Strickland* test. *See Chavez-Nelson*, 948 N.W.2d at 671. Considering the facts alleged in the petition as true and construing them in the light most favorable to Wynne, we conclude both that Wynne's trial counsel's performance was objectively reasonable and that, even if counsel had provided deficient representation, there was no reasonable probability that the result of the proceeding would have been different. *See Andersen II*, 913 N.W.2d at 422–23; *Nicks*, 831 N.W.2d at 504.[4]

---

[4] In his postconviction petition, Wynne alleged that his trial counsel "did not pursue . . . investigation into the possible alternative perpetrator Peeping Tom," but we will not consider this argument on appeal, unless prejudicial error is obvious on mere inspection, because Wynne inadequately briefed the issue by failing to provide any supporting argument or authorities. *See Andersen I*, 871 N.W.2d at 915. "The extent of counsel's investigation is considered a part of trial strategy[,]" *Opsahl v. State*, 677 N.W.2d 414, 421 (Minn. 2004), and "[i]t is within trial counsel's discretion to forgo investigation of leads not reasonably likely to produce favorable evidence," *Gustafson v. State*, 477 N.W.2d 709, 713 (Minn. 1991). *See also Nicks*, 831 N.W.2d at 506 (stating that trial counsel has "wide latitude to determine the best strategy for the client"); *Schneider v. State*, 725 N.W.2d 516, 521 (Minn. 2007) (stating that we give "particular deference to trial strategy"). "Generally, we will not review an ineffective-assistance-of-counsel claim when the attorney's conduct in question is based on trial strategy." *Chavez-Nelson*, 948 N.W.2d at 671. Moreover, for ineffective-assistance-of-counsel claims alleging a failure to investigate, we "must . . . assess the evidence that a proper investigation would have discovered and determine whether that evidence likely would have changed the outcome of the trial." *Williams v. State*, 764 N.W.2d 21, 31 (Minn. 2009) (quotation omitted). As discussed below, assessing the evidence that a "proper investigation" of alternative perpetrators would have discovered, we conclude that such evidence likely would not have changed the outcome of Wynne's trial. *Id*. We therefore discern no prejudicial error that is obvious on mere inspection of the district court's treatment of Wynne's failure-to-investigate claim.

**A.** **Trial counsel's efforts to introduce alternative-perpetrator evidence were not objectively unreasonable.**

As to the first *Strickland* prong, we conclude that trial counsel's representation did not fall below an objective standard of reasonableness, given his several attempts to introduce such evidence at trial.

"In Minnesota, the standard for attorney competence is representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *State v. Gassler*, 505 N.W.2d 62, 70 (Minn. 1993) (quotation omitted). "We presume that trial counsel's performance was reasonable . . . ." *Schneider*, 725 N.W.2d at 521.

Wynne's trial counsel filed a pretrial motion notifying the district court of his intent to assert the alternative-perpetrator defense.[5] The motion listed seven potential alternative perpetrators, including "kids not from the neighborhood," a "hooded man turning doorknobs," a "Peeping Tom," and the victim's former boyfriend. The district court denied

---

[5] "A defendant's constitutional right to a fair opportunity to defend against criminal charges includes the right to present evidence that" an alternative perpetrator committed the crime. *State v. Woodard*, 942 N.W.2d 137, 141 (Minn. 2020) (quotation omitted). A "motion to present alternative-perpetrator evidence is . . . subject to the foundation and admissibility requirements outlined in *State v. Hawkins*, 260 N.W.2d 150, 159 (Minn. 1977)." *Id.* The purpose of alternative-perpetrator evidence is "not to prove the guilt of the other person, but to generate a reasonable doubt of the guilt of the defendant." *Hawkins*, 260 N.W.2d at 158-59. The defense must lay a proper foundation "to avoid consideration of matters collateral to the crime." *Id.* at 159. And the evidence must have an inherent tendency to connect the other person with the commission of the crime. *See id.* "[E]vidence tending to incriminate another is *inadmissible* in the absence of proof of facts to connect that person with the crime." *Id.* (emphasis added). Once this foundation is laid, the defense may "introduce evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which would tend to prove the third person committed the act." *Id.*

the motion to admit alternative-perpetrator evidence, subject to review after an offer of proof. Following this ruling, Wynne's trial counsel repeatedly tried to provide the requisite offers of proof, both on the record and in writing during trial.

Wynne's trial counsel proffered that the victim had called the police about an unidentified group of kids who had tampered with a nearby fire hydrant many times, including on the night of the murder. But the district court ruled that the evidence was inadmissible based on an insufficient offer of proof, after the state disclosed that there was no evidence of any direct interaction between the victim and the alleged group of kids.

Wynne's trial counsel also proffered "Peeping Tom" evidence, asserting that a neighbor had witnessed an individual "pulling on doors and trying doors" on the night of the murder. After the district court declined to rule that the "Peeping Tom" evidence was admissible and instead ordered Wynne to produce the purported police reports to provide an accurate offer of proof, both the state and Wynne's trial counsel informed the district court that they could not locate such a report. The district court ultimately ruled that the proffered evidence relied on inadmissible hearsay.

Wynne's trial counsel sought to ask responding officers about their investigation into a confrontation between the victim and her former boyfriend, but the district court ruled the evidence was inadmissible because there was "nothing connecting [the victim's former boyfriend] with the scene that night" and the proffered facts would not meet the reverse-*Spreigl* balancing test of undue prejudice versus probative value.

And Wynne's trial counsel proffered evidence of a statement from a person named D.R. that he heard from a man named Rico that another man named J.T. was possibly

21

involved in the murder. But the district court declined to admit the evidence, reasoning that D.R.'s statement was inadmissible because it involved two levels of hearsay and neither Rico nor J.T. were available and subject to cross-examination.

Despite the foregoing, Wynne's trial counsel was able to pursue an alternative-perpetrator theory by eliciting testimony from the investigating sergeant that officers "learned of a vehicle that was in the alley early morning" on the day that the murder was discovered. Wynne's trial counsel also successfully introduced testimony from the neighbor, G.S., that, around the time of the murder, he saw a vehicle "sitting in the alleyway" with its lights shut off that "may have been behind [the victim's] house."

Based on the foregoing, and applying our customary presumption of reasonable performance, we conclude that the postconviction court did not abuse its discretion by determining that trial counsel exercised "the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *Gassler*, 505 N.W.2d at 70; *see also Schneider*, 725 N.W.2d at 521. Wynne's trial counsel made several attempts to establish an alternative-perpetrator defense—and, in fact, successfully introduced evidence about a vehicle parked behind the victim's home around the time of the murder—but much of the evidence counsel sought to introduce was inadmissible both because of evidentiary issues and for lack of an inherent connection to the victim's home at the time that the murder occurred. The performance rendered by Wynne's trial counsel therefore did not fall "below an objective standard of reasonableness." *Nicks*, 831 N.W.2d at 504.

**B.** **There is no reasonable probability that, absent trial counsel's allegedly deficient representation, the result of Wynne's trial would have been different.**

Even assuming without deciding that Wynne's trial counsel provided Wynne deficient representation, Wynne has not carried his burden under the second prong of *Strickland* to prove a reasonable probability that, without the alleged errors, there would have been a different trial outcome. *See Nicks*, 831 N.W.2d at 504; *Jackson*, 726 N.W.2d at 463.

Wynne's petition did not allege that there were any material facts in dispute and left no "doubts about whether to conduct an evidentiary hearing." *Nicks*, 831 N.W.2d at 504. Even considering the facts alleged in Wynne's petition as true and construing them in the light most favorable to Wynne, there is no evidence—either alleged in the petition or admitted at trial—linking most of the proffered alternative perpetrators to the crime scene. *Andersen II*, 913 N.W.2d at 422–23. And given the strength of the fingerprint and DNA evidence directly tying Wynne to the crime scene and victim, there is no reasonable probability that the introduction of additional "Peeping Tom" or other alternative-perpetrator evidence would have prompted a different result at trial. *See Nicks*, 831 N.W.2d at 504.

In sum, the postconviction court did not abuse its discretion by summarily denying Wynne's petition. There were no material facts in dispute and the petition's allegations, presumed true and construed in the light most favorable to Wynne, fail to carry Wynne's burden on both prongs of the *Strickland* test. *See Andersen II*, 913 N.W.2d at 422–23; *Nicks*, 831 N.W.2d at 506; *Jackson*, 726 N.W.2d at 463. The postconviction court's

23

thorough and reflective order denying Wynne's petition without a hearing was not based on an erroneous view of the law, against logic, or against the facts in the record. *See Brown*, 895 N.W.2d at 617.

**Affirmed.**